IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CIVIL ACTION NUMBER: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR. AMEET VOHRA; VOHRA WOUND | ) | |
| PHYSICIANS MANAGEMENT, LLC; | ) | |
| AND, VHS HOLDINGS, P.A., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

1.      This is an action brought by the United States of America ("United States") to recover treble damages and civil penalties arising from violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), and to recover damages under the common law theory of unjust enrichment.

2.      This action arises out of Vohra Wound Physicians Management, LLC ("Vohra WPM") and its majority owner, Dr. Ameet Vohra, knowingly causing the submission of false or fraudulent claims for payment to Medicare.

3.      Medicare covers wound care services, including wound debridement.  Wound debridement is a medical procedure to remove impediments to healing from a wound like unhealthy or dead tissue.

4.      Medicare covers different types of wound debridement, including less intensive non-surgical debridement procedures and more intensive surgical debridement procedures. Medicare reimburses at a higher rate for the more intensive surgical debridement procedures.

5.     In acute care facilities like nursing homes and skilled nursing facilities, elderly Medicare patients are prone to developing wounds such as pressure injuries (*i.e.*, bedsores) and often require wound care services.

6.     Vohra WPM and its related entities ("Vohra") is one of the largest specialty wound care providers in the country.  Vohra contracts with hundreds of acute care facilities across the United States, and Vohra's physicians provide wound care services to those facilities' patients at their bedside.  Dr. Vohra is the founder and 92 percent owner of Vohra WPM.

7.     Under its business model, Vohra agrees to provide all wound care services to the contracted facilities' patients at no cost to the facilities.  Vohra represents it will instead bill Medicare for the services provided at the facilities.

8.     From at least December 5, 2017, and continuing through the present, Vohra WPM and Dr. Vohra engaged in a nationwide scheme to bill the taxpayer-funded Medicare program for surgical excisional debridement procedures that were not medically necessary, and at times not actually performed, to maximize revenue.  Vohra physicians often performed less intensive non-surgical debridement procedures, but Vohra billed those procedures to Medicare as more intensive surgical excisional debridement procedures, which are reimbursed at a higher rate.

9.     Vohra WPM and Dr. Vohra drove this nationwide scheme in three main ways.

10.     *Design of its EMR*.  Vohra WPM and Dr. Vohra created a proprietary Electronic Medical Record ("EMR") system that limited the clinical data that could be entered, often forced physicians to select from pre-populated drop-down options, and severely restricted the type, amount, and quality of information physicians could record in the EMR system.  In fact, until April 2023, Vohra's EMR system only included one option for debridement procedures that the EMR simply labeled "debridement."  In the EMR system, it was impossible for a physician to

specify which type of debridement procedure was performed.  Then, Vohra WPM and Dr. Vohra programmed the EMR system to automatically bill all debridement procedures as the most expensive type of debridement procedure, surgical excisional debridements.  In Vohra's EMR system, less expensive, non-surgical debridements simply did not exist.

11.     Vohra and Dr. Vohra programmed the EMR system to automatically insert language in patients' charts that, on its face, appeared to be specific clinical observations and statements by the physician about the procedure and what the physician did during the procedure (*i.e.*, "with clean surgical technique…," among others).  But these sentences and phrases were instead just pre-programmed text. They are not based on, nor do they actually reflect, the scant information actually entered by the doctor.  These false medical records and procedure notes were created in an attempt to generate documentation that would support the services billed to Medicare and to evade scrutiny by Medicare and other payors in the event of an audit.

12.     *Incomplete and Misleading Training.* Vohra trained its physicians, most of whom lacked specific wound care expertise and had practiced in other specialties and/or other countries, to provide frequent debridement procedures.  But Vohra's training materials, like its EMR, did not recognize – let alone distinguish between – the different types of debridement or provide any information about the applicable Medicare payment rules.  Instead, Vohra intentionally omitted such information from its communications with physicians and its training materials while also assuring physicians that Vohra's proprietary EMR would handle all coding and billing for the physicians.

13.     *Aggressive Debridement Targets Backed by Enforcement*. Vohra pressured its physicians to perform as many debridements as possible.  Dr. Vohra and Vohra WPM set corporate targets for the number of debridements physicians were required to perform – that

steadily increased over time – and were based on revenue goals rather than patient care.

14.     Dr. Vohra and Vohra WPM closely tracked Vohra physicians' utilization of debridement procedures and enforced Vohra WPM's corporate targets through the use of tools that functioned as quota systems.  When physicians did not meet the expected targets, they were subjected to intense pressure to increase their debridement numbers.  This included disciplinary actions, probation, and threats of additional consequences like termination.  Physicians who met and exceeded the corporate targets received rewards and promotions.

15.     As a result of this scheme, Vohra submitted thousands of false claims to Medicare and received millions of dollars in reimbursement for surgical excisional debridement procedures that were not medically necessary, or not actually provided.

16.     Vohra WPM and Dr. Vohra knew or should have known that they could not submit claims to Medicare with billing codes that represented more complex procedures than were actually performed (commonly referred to as "upcoding") and that medically unnecessary services are not eligible for reimbursement from Medicare.

## I.     JURISDICTION AND VENUE

17.     This Court has jurisdiction under 31 U.S.C. § 3730 and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain the common law cause of action under 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over the Defendants because the Defendants reside and/or transact business in this District or committed proscribed acts in this District.

18.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c), as the place where Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred.

II.     **PARTIES**

19.     Plaintiff in this action is the United States of America, suing on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare program.

20.     Vohra WPM is a Delaware limited liability company with its principal place of business in Miramar, Florida.

21.     Defendant VHS Holdings, P.A. ("VHS Holdings") is a Florida S-corporation with its principal place of business in Miramar, Florida. VHS Holdings is the 92 percent owner of Vohra WPM.  Non-party Trivest Partners, L.P. owns the remaining 8 percent interest in Vohra WPM.

22.     Defendant Dr. Ameet Vohra, M.D. ("Dr. Vohra") is the founder and Executive Chairman of Vohra Wound Physicians Management, LLC and is a resident of Miami-Dade County Florida. Dr. Vohra is sole owner of VHS Holdings.

23.     Vohra WPM is a management company that provides management, administrative, billing, and other services to its related wound care practice entities pursuant to Management Services Agreements between the parties.

24.     The related Vohra practice entities include Vohra Wound Physicians of IL, S.C.; Vohra Post Acute Care Physicians of the East, P.A.; Vohra Wound Physicians of Mid-West, S.C.; Florida Post Acute Care Clinicians, LLC; Vohra Post Acute Care Physicians of Texas, PLLC; Vohra Wound Physicians of the West, P.C.; Vohra Wound Physicians of CA, P.C.; Vohra Wound Physicians of NY, PLLC; Vohra Post Acute Care Physicians of the Northeast, P.A.; and Vohra Wound Physicians of FL, LLC (collectively, "Practice Entities").

25.     Vohra WPM and the Practice Entities (collectively, the "Vohra Companies")

provide wound care services at patients' bedsides in various types of acute care facilities, including skilled nursing facilities ("SNFs") and nursing facilities ("NFs").

26.     The Practice Entities are currently owned by Vohra physicians.  However, from the beginning of the relevant time period until 2020, the Practice Entities were owned by Dr. Vohra, Vohra WPM, VHS Holdings, and Vohra WPM's Chief Medical Officer, Dr. Shark Bird.

27.     The Practice Entities are the entities that employ and/or contract with the Vohra physicians and enter into the contracts with the acute care facilities.[1]

28.     The Practice Entities are individually enrolled in the Medicare program, submit claims to Medicare, and receive Medicare payments.

29.     In exchange for a fee, Vohra WPM provides management and business services to the Practice Entities pursuant to Management Services Agreements.  Vohra WPM also manages the physicians who are employed by the Practice Entities.

30.     Pursuant to the terms of the Management Services Agreements, Vohra WPM provides all billing and collection services for the Practice Entities.  This includes selecting the Current Procedural Terminology ("CPT code") for the procedures or services performed by the physician, creating the claim that includes the selected CPT codes, and causing that claim to be submitted to Medicare on behalf of the Practice Entities.  Vohra WPM is also authorized to collect on physician services provided by the Practice Entities.

31.     The claims created by Vohra WPM for the services provided by the Practice Entities use the Practice Entities' National Provider Identifier ("NPI") numbers. Medicare reimburses the Practice Entities directly.

---

[1] The reference to 'physician' or 'physicians' (including 'its physicians' and 'Vohra physicians') throughout this complaint refers to the physicians who are employed or contracted by the Practice Entities and managed by Vohra WPM.

32.     Under the terms of the Management Services Agreements, the Practice Entities remit the majority of payments they receive from Medicare to Vohra WPM.

33.     The Practice Entities also assign to Vohra WPM all of their rights and interests in their revenues.  Under the terms of the Management Services Agreements, even if certain revenues are not legally assignable, the Practice Entities agree to turn over revenues they receive to Vohra WPM, including revenues received from federal health benefit programs like Medicare.

34.     Nearly all the payments received from Medicare flowed from the Practice Entities to Vohra WPM, which is 92 percent owned by VHS Holdings.  Thus, VHS Holdings was entitled to receive 92 percent of the profits and distributions from Vohra WPM.  Once the funds were in the possession of VHS Holdings, Dr. Vohra was entitled to take distributions as the 100 percent owner.

35.     In short, the Vohra Companies are structured to ensure that all monies collected from Medicare are controlled by Vohra WPM, and in turn, VHS Holdings and Dr. Vohra.

36.     From 2019 to 2023, Dr. Vohra took over $300 million in distributions from VHS Holdings.

## III.    THE FALSE CLAIMS ACT

37.     The FCA provides, in pertinent part, that any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim…

* * *

        is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1).

38.     The FCA further provides:

(1) the terms "knowing" and "knowingly" --

    (A)  mean that a person, with respect to information--

        (i)  has actual knowledge of the information;

        (ii)  acts in deliberate ignorance of the truth or falsity of the information; or

        (iii)  acts in reckless disregard of the truth or falsity of the information; and

    (B)  require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

39.    The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation as adjusted by the Federal Civil Penalties Inflation Act of 1990. 31 U.S.C. § 3729(a)(1)(G). For violations occurring after November 2, 2015, all civil statutory penalties, including the FCA, are subject to an annual adjustment for inflation pursuant to Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (Nov. 2, 2015). At this time, for all FCA penalties assessed after February 12, 2024, whose associated violations occurred after November 2, 2015, the penalty range is $13,946 to $27,894 per violation. 28 C.F.R. § 85.5.

## IV.    THE MEDICARE PROGRAM

### a.    <u>Background</u>

40.    In 1965, Congress enacted Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. § 1395 *et seq*., known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction. *See* 42 U.S.C. §§ 426, 426a.

41.    The United States administers the Medicare Program through HHS. HHS

delegates direct responsibility for the administration of the Medicare Program to its component agency, CMS.

42.     Medicare provides coverage for items and services that are reasonable and necessary to diagnose or treat an illness or injury or to improve a malformed body member. Payment will be provided if medical necessity can be substantiated.  42 U.S.C. § 1395y(a)(1)(A); Section 1862(a)(1) of the Act, CMS Manual System, Pub. 100-02, Medicare Benefit Policy Manual, Ch. 16, § 20.

43.     The Medicare Program consists of four parts: Parts A, B, C, and D.  42 U.S.C. §§ 1395c-1395w-154.  Medicare Part A ("Hospital Insurance Benefits for Aged and Disabled") generally covers, among other things, inpatient hospital services, post-hospital extended care services, home health services, and hospice care.  *See* 42 U.S.C. § 1395d *et seq.*  Medicare Part B ("Supplemental Medical Insurance for the Aged and Disabled") generally covers, among other things, physicians' services, services and supplies incident to physicians' services, and diagnostic tests.  *See* 42 U.S.C. § 1395k *et seq.*  Medicare Part C ("Medicare+Choice Program") allows eligible beneficiaries to elect to receive health benefits coverage through private insurance plans known as Medicare Advantage Organizations ("MAOs").  *See* 42 U.S.C. § 1395w-21 *et seq.* Medicare Part D ("Voluntary Prescription Drug Benefit Program") provides qualified prescription drug coverage to eligible beneficiaries.  *See* 42 U.S.C. § 1395w-101 *et seq.*

44.     To assist in the administration of Part B, CMS contracts with Medicare Administrative Contractors ("MACs") to administer and pay Part B claims submitted by health care providers from the Medicare Trust Fund.  42 U.S.C. §§ 1395u, 1395kk-1; 42 C.F.R. §§ 421.3, 421.100, 421.401, 421.404.  Physicians submit claims for payment to MACs on behalf of Medicare beneficiaries and, in turn, the MACs process and pay those claims.

45.     CMS developed the National Provider System, which issues a unique health identifier for health care practitioners, known as the NPI.  All group practices, physicians, and non-physician providers must have an assigned NPI number when enrolling with a Government payor.  Group practices can also use their Tax Identification Number ("TIN") to submit claims.

46.     Physicians, practitioners, and entities that furnish health care services under Medicare are defined as Suppliers.  42 C.F.R. § 400.202.

47.     Suppliers, like physicians and entities that furnish health care services, that wish to submit claims for Medicare reimbursement must enroll in the Medicare Program.  As part of the enrollment process, the entity must certify its compliance with Medicare laws, regulations, and program instructions and conditions.  *See* 42 C.F.R. § 424.510.  Enrolled entities also have a duty to be knowledgeable of and comply with the statutes, regulations, and program instructions and conditions regarding coverage for services for which they seek reimbursement.  *See* 42 C.F.R. § 424.516(a).

48.     Once the entity is enrolled or credentialed, the enrolled entity may submit claims to Medicare for services rendered to the patients.

49.     When submitting claims to Medicare, the enrolled entity must identify the CPT for the procedures or services performed.  The CPT codes are maintained by the American Medical Association.  CMS assigns reimbursement amounts to the CPT codes as set forth in the Medicare Physician Fee Schedule ("PFS").  Enrolled entities are compensated for outpatient physicians' services on a fee-for-service basis in accordance with the PFS.

50.     When seeking reimbursement from Medicare Part B for services rendered, enrolled entities must submit claims on Form CMS-1500 or its electronic equivalent, 837P.  42 C.F.R. § 424.32.

51.     Both the Form CMS 1500 and the 837P require enrolled entities to identify the patient's diagnosis, the CPT code of the services rendered and for which reimbursement is sought, and the unique billing identification number of the rendering provider and the referring provider or other source.  45 C.F.R. § 162.1002; CMS Medicare Claims Processing Manual ("MCPM"), Pub. 100-04, Chapter 23, § 20.7 *et seq.*

52.     Form CMS-1500 requires enrolled entities to certify that (1) the information provided is "true, accurate, and complete"; (2) they "have familiarized themselves with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor"; and (3) the submitted claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)[.]" https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf (last visited Mar. 18, 2025).

53.     Form CMS-1500 also provides that "[a]ny person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

54.     The 837P, the electronic equivalent of the Form CMS-1500, refers to the format for electronic claim submission—the flat file format or data set format requirement for electronic claim submission.

55.     To submit claims using the 837P, enrolled entities must apply for an Electronic Data Interchange ("EDI") account.  The certification on the EDI Enrollment Form serves as signature for each and every claim submitted under the CMS-assigned unique identifier number

(submitter identifier).

56.     The applicant certifies "that it will submit claims that are accurate, complete, and truthful" and acknowledges that (1) "all claims will be paid from Federal funds," (2) that the submission of such claims is a claim for payment under the Medicare program, and (3) that "anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim" may be subject to a fine and/or imprisonment under applicable Federal law.  CMS Medicare Claims Processing Manual, Pub. 100-04, Chapter 24, § 30.

57.     Standardized coding is essential so Medicare can process claims in an orderly and consistent manner and, thus, providing accurate CPT codes on claims submission forms is material to payment.

58.     Because it is not feasible for Medicare personnel to review every patient's medical records for the millions of claims for payments they receive from physicians and other entities, the program relies on Suppliers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

59.     Generally, once a CMS-1500 or electronic 837P is submitted to Medicare, the claim is paid directly to the submitting entity or physician without any review of supporting documentation, including medical records.

60.     Medicare only pays for services that are actually rendered, and that are "reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body

member").  Part B providers also must certify that services are medically necessary.  42 C.F.R.

§ 424.24(g)(1).  Medicare will not reimburse a provider for services that are not reasonable and

necessary.

**b.   Medicare Reimbursement for Debridement Procedures**

**i.   Overview of Wound Healing and Types of Debridement Procedures**

61.     Wounds typically go through four stages of healing, sometimes referred to as "the

healing cascade."  These phases are called (1) the Hemostasis Phase, (2) the Inflammatory Phase,

(3) the Proliferative Phase, and (4) the Remodeling Phase.  *See, e.g.,* "The four phases of wound

healing" by Dr. Christopher Leonard, June 4, 2020, available at

https://cert.vohrawoundcare.com/the-four-stages-of-wound-healing-an-updated-overview-for-

clinicians/ (last accessed Mar. 18, 2025).

62.     In the Hemostasis Phase, the objective is to stop the bleeding, and the body

activates its blood clotting system.

63.     In the Inflammatory Phase, the body focuses on destroying bacteria and removing

debris (essentially cleaning out the wound), thereby preparing the open area of the wound

(commonly referred to as the "wound bed") for the growth of new tissue.

64.     In the Proliferative Stage, new tissue begins to build and grow to fill the wound

bed forming granulation tissue.  Granulation tissue often appears as pink/red, bumpy,

cobblestone-like tissue and is an indicator that the wound has started to progress beyond the

Inflammatory Stage and towards healing.

65.     In the Remodeling Phase, the new tissue becomes stronger and more flexible

resulting in scar tissue formation.

66.     At times, wound healing may stall when going through the healing phases and

may not heal within the expected timeframe.  Such wounds are known as "chronic wounds" and often require treatment to progress into the Proliferative (development of new healthy tissue) and Remodeling (scarring) Phases.  Forms of treatment might include applying various forms of dressings to the wound, applying medicated gels or ointments to the wound, using water and gauze to wash away unhealthy and/or dead tissue, using sharp tools to scrape off unhealthy and/or dead tissue from the wound bed, or, when necessary, surgically excising (a medical term meaning cutting out entirely) all unhealthy and/or dead tissue from a wound.

67.     A debridement is the removal of contaminated, devitalized, damaged, necrotic (dead), infected, and/or foreign tissue from a wound in order to promote healing.  Removing such tissue stimulates the wound to progress through the healing phases and can reduce the risk of infection, promote the production of healthy granulation tissue, and speed up the wound healing process.  Sometimes, a surgical procedure is necessary to accomplish these objectives, but often times not.

68.     The usual course of treatment for managing wounds that require surgical debridement involves first excising, or cutting out entirely, all unhealthy or dead tissue from the wound and exposing healthy bleeding tissue.  This often causes the wound to return to the Hemostatic Phase (*i.e.*, bleeding and clotting phase) and will reset the wound healing process to start again.  This type of procedure is called surgical excisional debridement.

69.     Thereafter, the goal is to keep the wound in a state that is conducive to healing by removing impediments to healing such as slough, fibrin, unhealthy tissue, and/or dead tissue from the surface of the wound bed.  This is often accomplished by using a sharp tool like a scalpel or curette to scrape the unhealthy tissue from the wound bed and is more superficial in nature.  This type of maintenance or clean-up procedure is called selective debridement and is a

common, often recurring procedure used for active management of chronic wounds.

Practitioners also refer to selective debridement as "active wound management" and

"conservative sharp debridement."

70.     Medicare recognizes these differences and reimburses for both surgical excisional

debridement and selective debridement.  Surgical excisional debridement is reimbursed at a

higher rate than selective debridement.

71.     Surgical excisional debridement is billed to Medicare using CPT codes 11042 to

11047.  Medicare reimburses surgical excisional debridements as global surgical packages,

meaning there is a single payment to the provider for all services and supplies provided by the

physician that are considered part of the surgery, including an examination of the patient.

72.     The CPT codes for surgical excisional debridement are based on the deepest level

of tissue that is surgically excised during the procedure, including subcutaneous (11042/11045),

muscle/fascia (11043/11046), and bone (11044/11047).  CPT codes 11042-11044 are used to

report the first 20 square centimeters, or part thereof, of tissue debrided.  Thereafter, the add-on

codes (11045-11047) are applied to report each additional 20 square centimeters, or part thereof,

in conjunction with 11042, 11043, and 11044.

73.     Selective debridement is billed to Medicare using CPT codes 97597/97598.  CPT

code 97597 is used to report the first 20 square centimeters, or part thereof, debrided.  Thereafter,

the add-on code (97598) is applied to report each additional 20 square centimeters, or part

thereof, in conjunction with 97597.

### ii.  Debridement Reimbursement in Different Patient Settings

74.     Medicare pays differently for these procedures depending on the setting or place

of service performed.

75.     Medicare Part B reimburses for surgical excisional debridement regardless of whether the service is performed in a nursing facility ("NF"), a skilled nursing facility ("SNF"), an assisted living facility ("ALF"), or a physician's office.

76.     Selective debridements are also reimbursed by Medicare Part B in certain settings. However, Medicare Part B does not reimburse selective debridements when they are performed on patients for which a facility is receiving a bundled payment that already includes reimbursement for selective debridements.

77.     For example, the consolidated payment under Medicare Part A for SNF patients includes payment for selective debridements.  42 U.S.C. § 1395yy(e)(2)(A); 42 C.F.R. § 411.15(p)(1) (noting that the SNF Prospective Payment System per diem represents Medicare's payment for all costs of providing covered Part A SNF services except services expressly excluded from consolidated billing).

78.     The CPT codes for selective debridement (97597 and 97598) are considered "sometimes therapy" codes according to Chapter 6, Section 20, of the Medicare Claims Processing Manual, and may be provided by various types of practitioners.  However, such services furnished to SNF residents "remain subject to consolidated billing even when performed by a type of practitioner, such as a physician whose services would otherwise be excluded" from consolidated billing under 42 U.S.C. § 1395yy(e)(2)(A).

79.     As further explained in the MCPM,

> while most services either clearly fall within the category of therapy or clearly fall outside of it, there are a few services (such as certain debridement codes) which, based on the specific type of practitioner involved, are sometimes considered "therapy" services and other times not. However, because the consolidated billing provision focuses on the nature of the therapy service itself (rather than the type of practitioner who happens to be performing it), these "sometimes therapy" codes are always considered therapy services

in the specific context of SNF consolidated billing. This means that a practitioner who furnishes such a service to an SNF resident must **always** look to the SNF itself (rather than to Part B) for payment.

CMS Medicare Claims Processing Manual, Pub. 100-04, Chapter 5, Section 20.5 (emphasis in original).

80.     Thus, if an outside physician performs a selective debridement on a SNF patient, and the SNF is receiving a bundled payment for that patient's care, the physician must bill the SNF for the selective debridement, not Medicare, because Medicare already paid the SNF for selective debridement services via the Part A bundled payment.

### iii.     Surgical Excisional Debridements and Modifier 25

81.     Separate evaluation and management ("E&M") services are generally not payable on the same day as a surgical excisional debridement because global surgical packages include reimbursement for an E&M service.

82.     As such, CMS instituted a National Correct Coding Institute ("NCCI") Procedure to Procedure ("PTP") edit that causes the payment system to automatically reject E&M claims billed on the same day as a global surgical package.

83.     However, an E&M service *is* payable on the same day as a global surgical package where a "significant and separately identifiable" service was provided in addition to the global surgical package.  NCCI Policy Manual for Medicare Services, Ch. XI, § U; CMS Medicare Claims Processing Manual, Pub. 100-04, Ch. 12 § 30.6.6B.

84.     Where a significant and separately identifiable service is provided, a provider may append Modifier 25 to the E&M claim. Modifier 25 indicates that the E&M service was significant and separately identifiable, and the modifier causes the payment system to pay for the E&M claim rather than automatically reject it.  *Id*.

## V.     VOHRA'S SCHEME TO DEFRAUD MEDICARE

### a.   Vohra's Business Model

85.     The Practice Entities operate in nearly every state and submit Part B claims to Medicare through the MAC and submit Part C claims to MAOs.  Nearly all of their revenue is derived from reimbursement of Medicare Part B and Medicare Part C claims.

86.     The Vohra Companies' business model is for the Practice Entities to contract with NFs and SNFs to provide physician services for wound care (and other skin issues) at patients' bedsides at no cost to the facilities.  Many of the facilities the Vohra Companies contract with are reimbursed for the care they provide to their patients through bundled Medicare Part A payments.

87.     Pursuant to Management Services Agreements, Vohra WPM manages nearly all aspects of the Practice Entities and makes all operational, business, and administrative decisions related to the Vohra Companies' wound care practice.

88.     Vohra WPM is responsible for physician recruitment under the Management Services Agreements, and Vohra WPM makes all decisions with respect to physician hiring, physician pay, and physician incentives and discipline.

89.     Vohra WPM makes all decisions with respect to the development, design, implementation, and operation of the EMR.

90.     Vohra WPM makes all decisions about the content of the claims and the manner in which claims are submitted to Medicare and other payors.

91.     Once a facility contracts with the Practice Entities, Vohra WPM assigns a Vohra physician to the facility.  That assigned physician ("line physician") conducts weekly rounds at the facility on patients with wound or other skincare needs and provides services at their bedside.

92.     The line physicians report to a supervisory physician, usually by region.   These supervisory physicians are appointed by Dr. Vohra and Vohra WPM.  The supervisory physicians are responsible for implementing corporate policy as directed by Vohra WPM and Dr. Vohra.

93.     Until mid-2022, supervisory physicians were referred to as Lead Physicians or Clinical Leads.  Thereafter, Dr. Vohra and Vohra WPM began appointing Regional Medical Directors.  Upon information and belief, the Regional Medical Directors serve a similar function as the Lead Physicians and are responsible for implementing corporate policy as directed by Vohra WPM and Dr. Vohra.  Indeed, several of the same physicians who were formerly referred to as Lead Physicians or Clinical Leads became Regional Medical Directors.

94.     To entice facilities to use the Vohra Companies' services, Vohra WPM markets the Vohra Companies as providing wound care services free of charge to facilities.

95.     Vohra WPM represents to potential facilities that it will not bill the facilities and will, instead, seek reimbursement from Medicare and other payors.

96.     Vohra offers wound care services, staff education, expert consulting, cost savings and facility reimbursement enhancement all at no cost and with no financial risk to the facility. Specifically, Vohra WPM represents that it will:

        a.   Manage, lead, and provide all skin and wound care services to the facilities' patients on a weekly basis at no cost to the facility;

        b.   Provide education and support for facility staff at no cost;

        c.   Assist the facilities with state surveys and litigation at no cost; and

        d.   Reduce facility out of pocket costs and optimize facility reimbursement at no cost.

19

97.     Contracts between the Practice Entities and facilities state that the Vohra Companies will not seek payment from the facilities, including for claim denials or uncollected copays or deductibles.  If the Vohra Companies cannot bill or do not get paid for care they provide, the Vohra Companies do not bill the facility for that care.

98.     This marketing pitch is attractive to facilities because it allows them to rely on an outside provider to perform their wound care services at no cost and to reduce or avoid expenses they might otherwise have to pay facility personnel or others to perform.

99.     At the same time, Vohra WPM's presence in the facilities can increase the facilities' reimbursement amounts and enhance revenue.  Although the facilities are not billing Medicare for the services the Vohra Companies provide, the facilities are reimbursed based on the acuity of the patient in several contexts.  Therefore, documenting more wound-related diagnoses and treatments will reflect higher acuity patients and, therefore, can increase reimbursement under Medicare Part A and Medicare Part C.

100.    Until mid-2018, Vohra WPM was managed by a small, close-knit group of executives. Although their titles changed over time, their core functions remained the same.  This group included Dr. Vohra, the founder and Executive Chairman; Dr. Shark Bird, the Chief Medical Officer (CMO); Dr. Christopher Leonard, the Chief Information Officer (CIO); and Dr. Japa Volchok, the Chief Operating Officer (COO).

101.    These individuals oversaw the day-to-day aspects of the Vohra Companies' operations.  They communicated almost daily via group emails and in-person meetings.

102.    The CMO was charged with implementing corporate policies among the line and lead physicians and ensuring compliance with same.  The CIO was charged with the development and implementation of Vohra WPM's proprietary EHR system.  The COO was

20

charged with revenue cycle management, reviewing Medicare rules and regulations, and providing input on how services could be billed for purposes of revenue maximization and EHR development.

103.     Dr. Vohra directed the CMO, CIO, and COO in their respective roles.  Dr. Vohra had the final say and was the ultimate decision-maker on Vohra WPM's business and operational decisions.

104.     In December 2016, Trivest Growth Investment Fund (Trivest) invested $225 million in Vohra and became a minority owner.  Thereafter, Vohra WPM hired John Sory as President and Chief Executive Officer (CEO) in or around March 2018, and Michael Evanoff as Chief Financial Officer (CFO) in or around January 2019.

105.     At that time, Dr. Vohra was pursuing the sale of the Vohra Companies and evaluating potential opportunities with private equity firms.  Thus, the CEO and CFO were charged with readying the company for such a sale, including the improvement of management and operational functions at Vohra WPM and increasing revenue to garner a higher sale price.

106.     Upon their hiring, the CEO and CFO worked with Dr. Vohra, the CMO, the CIO, and the COO in the same manner described above and comprised the executive management team.  These individuals oversaw the day-to-day aspects of the Vohra Companies' operations, and they communicated almost daily via group emails and in-person meetings.  Dr. Vohra remained the ultimate decision-maker and had the final say on Vohra WPM's business and operational decisions.

**b.   Vohra WPM and Dr. Vohra Caused the Practice Entities to Submit Claims to Medicare Part B for Medically Unnecessary and Upcoded Surgical Debridements**

107.     The usual course of treatment for managing pressure injuries involves initially

performing one or two surgical excisional debridements to remove all necrotic (*i.e.*, dead or dying) tissue and expose healthy viable tissue to reset the wound bed.  Thereafter, selective debridements, or conservative sharp debridements, are performed on as as-needed basis to remove unhealthy and/or necrotic tissue from the wound bed.  Additional surgical excisional debridements are generally not needed if the wound is improving and healing.

108.    "Initial debridement may be deep and through skin, subcutaneous tissue, muscle fascia, and muscle. Subsequent debridement is often more superficial and best described by CPT codes 97597 or 97598 rather than 11043 or 11044."  National Government Services, Inc., Local Coverage Article A56617, Billing and Coding: Debridement Services, effective 8/1/2019, revision effective 1/1/2024 to present.

109.    Although wound treatment protocol varies based on the characteristics of the individual patient and wound, continued, serial surgical excisional debridements at high rates are generally not necessary or appropriate.  MACs universally warn against overutilization of debridements, and various Local Coverage Determinations ("LCD") and other Medicare educational materials provide guidance on the usual number and frequency of surgical excisional debridements.

110.    Vohra WPM and Dr. Vohra were aware of the applicable Medicare rules, regulations, and guidance.  The COO regularly monitored this information, including changes to the applicable LCDs.  The COO relayed this information via email and in person to the executive team.

111.    Nonetheless, the Vohra Companies billed Medicare for surgical excisional debridements, on the same wound, week after week and received millions of dollars of reimbursement for surgical excisional debridements that were not medically necessary.

112.    Indeed, the Vohra Companies submitted hundreds of thousands of serial surgical excisional debridement claims that were the ninth surgical excisional debridement or more for a particular wound.

113.    For the time period November 2017 through April 2024, over 165,000 visits involved the ninth surgical excisional debridement or more of a wound, over 70,000 visits involved the fifteenth surgical excisional debridement or more of a wound, and over 40,000 visits involved the twentieth surgical excisional debridement or more of a wound.

114.    Billing for surgical excisional debridements as described herein allowed the Vohra Companies to generate more revenue due to the higher reimbursement rates.

115.    Billing for surgical excisional debridements as described herein also allowed the Vohra Companies to create a business model where it avoided having to charge its client facilities for the services provided to their residents.

116.    This is because, in certain circumstances, Vohra cannot charge Medicare for non-surgical debridement procedures.

117.    Specifically, when Medicare pays for a patient's care via a bundled payment to the facility (which is a single payment for the combined cost of covered services and supplies during a patient's stay), and that bundled payment includes payment for non-surgical debridement procedures, it is the expectation that the facility will be providing such services. Therefore, outside physicians cannot also bill Medicare for non-surgical debridements because this would cause Medicare to pay twice for the same service.  Instead, the outside physician must bill the facility and not Medicare in those circumstances.

118.    To circumvent this requirement, the Vohra Companies billed any kind of debridement procedure its physician performed as surgical excisional debridements (which are

23

never included in bundled payments to facilities) for nearly eight years.  This allowed the Vohra Companies to make good on its primary marketing promise to facilities: that Vohra would handle all skin and wound management services for the facilities it contracted with free of charge.

119.    For eight years, from March 2015 to April 2023, Vohra WPM did not allow its physicians to bill for selective debridements.  During this period, Vohra WPM programmed its EMR to bill all debridements as surgical excisional debridements despite its representation that the Practice Entities provided <u>all</u> wound care services for the facilities with whom they contracted.

120.    Although photographing wounds to evaluate the healing process is common industry practice for wound care providers, at Dr. Vohra's direction, the Vohra Companies did not take photographs of wounds.

### i.  Vohra WPM and Dr. Vohra Created a Proprietary EMR Software That Automatically Billed All Debridements as Surgical Debridements

121.    Vohra WPM and Dr. Vohra developed a proprietary, highly automated electronic medical record (EMR) system to drive maximum Medicare revenue into the Vohra Companies. Vohra WPM's EMR system restricts what information is available to physicians, limits clinical choice, and controls what services are ultimately billed.

122.    Vohra WPM used its EMR to create false and misleading medical records to pass audits and ensure its Medicare revenue stream for surgical excisional debridement claims would continue and grow.

123.    For debridement specifically, Vohra WPM and Dr. Vohra programmed its proprietary EMR to restrict its physicians' clinical choices and minimize the clinical information that its physicians were able to enter into the EMR system.  In addition, Vohra WPM

programmed its EMR to insert autogenerated clinical information that was not entered by the physician into the final procedure reports.

124.    The physician-facing version of the EMR consisted of various options and drop-down menus for the physician to select from, and there were very few areas in which a physician could document their impressions, observations, and other clinically relevant information from a patient encounter.

125.    If the physician listed any percentage of devitalized material in the wound bed, a debridement procedure was mandatory.  Unless the physician marked that one of a scant few, narrow "Reasons for No Debridement" applied, the EMR would not let the physician continue to document the encounter without documenting a debridement procedure.  The use of "Reasons for No Debridement" was closely monitored by Vohra WPM management and Dr. Vohra, and Vohra Physicians were subject to retraining if they used it to override mandatory debridement too often.

126.    When documenting a debridement procedure, Vohra WPM's EMR system allowed a physician to record only a few clinical data points.  Other than indication for debridement, the EMR permitted the physician to record only: (i) tissue type, (ii) anesthesia used, (iii) instrument used, and (iv) post-debridement wound depth.  For the first debridement of a wound only, informed consent was also recorded.  In addition, the clinical information that could be recorded for tissue type, anesthesia, and instrument used was strictly limited to a few one or two-word choices on a drop-down menu.  Of the data points purporting to record the procedure itself, only post-debridement depth allowed free entry of a (numeric) answer.

127.    Vohra WPM's EMR did not ask for or allow the physician to document any other information about the procedure including, for example: (i) whether the patient tolerated the

procedure or experienced pain; (ii) whether the procedure was completed as intended or was left incomplete; (iii) whether the procedure resulted in any bleeding, and if so, whether it was stopped; and (iv) whether all of the dead or unhealthy material in the wound was removed, or just some of it, and if so, how much was actually removed.

128.   Despite the lack of clinical input, the EMR system automatically added what purported to be patient and procedure specific clinical observations by the treating physician to the procedure note in the medical record, but was instead just pre-programmed text, generated by the EMR, without any input from the treating physician.

129.   For example, Vohra WPM programmed the EMR to automatically insert the amount of tissue supposedly removed from a wound during a debridement procedure without any input from the treating physician, and then programmed the EMR to submit claims based on this automated information.

130.   This is problematic because the size of the debrided tissue dictates what codes should be billed: the base CPT codes (11042, 11043, and 11044) are used to report the first 20 square centimeters debrided, and the add-on CPT codes (11045, 11046, and 11047) are used to report each additional 20 square centimeters (or part thereof) debrided beyond that.

131.   Vohra WPM programmed its EMR (1) to only allow the physician to record the amount of necrotic or devitalized tissue in the wound, but not the amount of necrotic or devitalized tissue removed from the wound, (2) to assume, without confirmation from the physician, that 100 percent of the necrotic or devitalized tissue was debrided and insert that measurement into the patient's medical record, and (3) to automatically select the CPT codes, including the use of the add-on codes, based on that measurement added by the EMR, not the physician.

132.     However, as described in greater detail *infra*, Vohra WPM knew that its physicians often debrided and removed less than 100 percent of the devitalized and necrotic tissue from patients' wounds and, therefore, its EMR was generating false documentation and claims to Medicare.

133.     These fake clinical observations that were added to the medical records were critical to Vohra WPM's Medicare revenue maximization scheme.  Without the added fake observations, Vohra WPM's surgical excisional debridement claims would not survive a claims audit.  On its own, the scant data physicians actually entered does not reflect or support the performance of a surgical excisional debridement.

134.     Moreover, without the added fake observations, Vohra would have been unable to pass any audit of its claims for payment under the add-on surgical excisional debridement codes.  The data physicians actually entered does not reflect the amount of tissue removed or the size of the area actually debrided and, therefore, does not support the use of the add-on codes.

135.     During the time period relevant to this case, Vohra WPM caused the submission of over 170,000 claims to Medicare for additional reimbursement under the add-on codes, and Medicare paid the Practice Entities millions of dollars on those claims.

136.     But for each of those claims, the treating physician was not asked and did not record *any* amount of tissue actually removed during the procedure, or any other data that would support those claims.  The EMR literally did not allow it.

137.     When a physician finished documenting for a patient, the EMR automatically generated and submitted claims based on the limited information selected and input by the physician and in accordance with the billing logic implemented by Dr. Vohra, the CIO, the CMO, and the COO.

138.   Dr. Vohra was intimately involved in the evolution and implementation of the EMR and provided the final approval for its billing logic.

139.   Vohra WPM pointed to these features to recruit physicians assuring them that they would be free from coding and billing.

140.   For example, in a promotional video on Vohra WPM's YouTube channel, Dr. Aaron Blom, a supervisory physician at Vohra WPM, stated:

> our EMR is so slick and so well-designed that it minimizes the amount of time that I have to spend away from the patient.  Our EMR is very advanced.  It does all of our billing, all of our coding, and all of our documentation at the same time, which is really incredible because for anyone thinking of joining this practice, you have to understand that you don't have to do any of the billing or coding yourself, it all gets done automatically for you once you type in your patient note.

"Freedom from coding and billing for Dr. Aaron Blom, thanks to Vohra EMR."

YouTube, uploaded by Vohra Wound Care, Nov. 13, 2020, available at youtube.com/watch?v=uHoHn6JphUc (last accessed Mar. 18, 2025).

141.   *Design of Relevant EMR Features*.  Beginning in late 2014, Vohra WPM conducted a pilot program that influenced the specific design and logic of its proprietary EMR system.  The pilot program tested whether Medicare would pay for selective debridements under Part B in certain circumstances.  Dr. Vohra directed this pilot program, which he implemented with the assistance of the CMO, the CIO, and the COO.

142.   As part of the program, Vohra WPM added a selective debridement procedure option to its EMR and coded and billed those procedures as selective debridements to CPT codes 97597 and 97598.

143.   Vohra ended the pilot project after only a couple of months because CMS started denying claims and seeking overpayments from Vohra for selective debridements performed at

SNFs, confirming that the service was one that Vohra must bill the facility for, not Medicare.

144.     In an email dated February 4, 2015 from the COO to the CMO, the CIO, and Dr. Vohra, the COO stated: "I think we need to put the selective debridement codes on hold effective immediately. … What I am seeing now is that our test claims we submitted that got paid Medicare is now recouping monies.  In addition claims we sent at the end of December are being denied and the denial reason is these should be billed to the facility even for POS 32 patients."

145.     The COO went on to explain that he reviewed the CMS website, and it showed that CPT codes 97597 and 97598 are subject to SNF consolidated billing, and the physician "must look to the SNF for payment of these services."  The COO concluded that "we likely can never bill selective codes as they are being consider [sic] subject to consolidated billing in both the Part A and Part B stays."

146.     In response, Dr. Vohra instructed the CIO to create an urgent version release of the EMR that erased selective debridement altogether.  On or about February 6, 2015, Vohra WPM, at the direction of Dr. Vohra, disabled the choice between selective and surgical excisional debridement in the EMR.  For the next eight years, the physician facing version of the EMR offered only "debridement" as a selection option for physicians, and the EMR automatically coded and billed all debridement procedure claims with surgical excisional debridement codes.

147.     Thereafter, Vohra WPM nonetheless continued to promise facilities that the Vohra Companies handled all wound care services for the facilities they contracted with and that the Vohra Companies would not bill the facilities for the services provided.

148.     _Knowledge of Difference Between Selective and Surgical Excisional Debridement_.  Internal communications during the pilot program show that Vohra WPM and Dr.

Vohra understood that selective debridements are distinct from surgical excisional debridements.

149.    A proposed utilization guide created by Vohra WPM and shared between the CIO and Dr. Vohra explains that the selective procedure: "[i]s 'selective' in that it discriminates between non-viable tissue (frank necrosis, eschar, biofilm, bioburden, cellular debris) from[sic] underlying healthy tissue (bone, muscle, subcutaneous tissue)."  The utilization guide distinguishes selective debridement, explaining "since the clinician is not excising significant vascularized and sensate tissue, it is a less extensive procedure than surgical excisional debridement and hence there is a lower expectation for pain or bleeding."  The selective procedure is "most appropriate[]" for use "with chronic and/or stagnant wounds" and "will bolster reimbursement for active wound management[.]"

150.    In its December 2014 newsletter to Clinician Leads, Vohra WPM explained:

> the surgical excisional debridement would likely be the initial
> action for fresh or deteriorated wounds, for which you would
> receive a consult, or the patient who recently arrived as a hospital
> discharge with wounds that are likely to have significant necrotic
> tissue and would require surgical excisional debridement for frank
> necrosis etc. … The selective debridement, however, could be
> thought of as a procedure to stimulate wound healing, reduce
> bacterial bio-burden and increase healing time…."

151.    Thus, Vohra WPM and Dr. Vohra agreed with the usual course of treatment for pressure injuries (the same course of treatment described in LCD Reference Article A56617), and Vohra WPM and Dr. Vohra knew and understood that surgical excisional debridements and selective debridements were distinct and independent types of procedures.

152.    As stated by the CMO in an email dated June 10, 2015: "In terms of selectives, it is easy, in my mind, how these should be utilized from a purely clinical standpoint but it seems that reimbursement is the main determinant…."

153.    Despite this knowledge, Vohra WPM cut off the ability to document and bill for

selective debridement procedures, continued representing to facilities that the Vohra Companies would provide all wound care needs for their patients, and billed all debridement procedures performed as surgical excisional debridements for eight years.

### ii. Vohra WPM and Dr. Vohra Recruited Non-Wound Care Specialists and Trained Them to Perform Selective Debridements

154.    Although Dr. Vohra and the Vohra Companies removed the selective debridement option from its EMR, they continued to train physicians to perform selective debridements but used artful and carefully designed language designed to avoid referencing them as such.

155.    When hiring, Vohra WPM targets physicians from general specialties, not physicians experienced in delivering and billing for wound care in the NF or SNF setting.  This makes it easier for Vohra WPM to instill and enforce a uniform approach to performing and documenting debridement procedures.

156.    Even though Vohra WPM eliminated the ability to document and bill for selective debridements and erased the concept of selective debridement from the company's clinical vocabulary, Vohra WPM nonetheless continued instructing its physicians to perform selective debridements using sharp instruments, albeit without referring to them as such.

157.    Vohra WPM trained its physicians that debridement using a sharp instrument was the best and fastest way to remove necrotic or other devitalized tissue from a wound.  Vohra taught its physicians (1) that repetitive debridement is the best approach to wound healing; (2) that selective removal of some, but not all, of the necrotic or devitalized tissue in the wound is appropriate when necessary, and (3) that it was often not necessary or appropriate to remove any healthy tissue.  This describes selective debridement, not surgical excisional debridement.

158.    For example, Vohra WPM's CMO explained in a training video that "Surgical sharp debridement is removal of necrotic tissue with a curette or blade…[Y]ou have to remember

that sharp surgical debridement is removal of the necrotic tissue using an instrument – it's going to be a sharp round blade like a curette or a surgical blade, usually like a 15 blade."

159.    This describes conservative sharp debridement, a form of selective debridement, not surgical excisional debridement.  The use of a sharp instrument does not automatically or necessarily transform a selective debridement into a surgical excisional debridement.  Indeed, as noted, Medicare explicitly advised providers that sharp instruments may be used to perform selective debridements.

160.    In a video training video titled "Introduction to Debridement" made in 2020, Vohra WPM stated "our surgical debridement – our sharp debridement – is highly selective."

161.    The video also stated that sharp debridement is "very selective – in skilled hands you can leave all the healthy tissue behind."

162.    Vohra WPM also trained its physicians that repeated sharp debridement procedures are necessary because you might not get all the necrosis out on the first try.  In a training video titled "Wound Care Treatment Options," the CMO explained that "this is often true when we are doing bedside debridements in elderly patients."

163.    Similarly, in a 2017 training video titled "Learn about debridement," a Vohra physician explained "if there's any tissue left behind that needs to be debrided we can apply certain topical agents to dissolve – and hoping that the next week when I come back there's less dead tissue and more healthy tissue that we can stimulate to grow."

164.    All of these trainings recognize that debridement procedures performed by Vohra physicians often involve removing some, but not all, necrotic tissue, and this is normal and to be expected.  Again, this describes selective debridement.

165.    Indeed, Vohra physicians acknowledged they performed debridement procedures

during which they removed some, but not all, necrotic tissue; where there was no or minimal

bleeding; and that such procedures were performed week after week on chronic wounds.

166.    Thus, Vohra WPM trained its physicians to provide, and its physicians did

provide, selective debridements during the relevant time period despite Vohra WPM billing all

debridement procedures as surgical excisional debridements until April 2023.

167.    *EMR Change and Training Post-April 2023*.  In April 2023, following scrutiny by

the Government about how the Vohra Companies billed debridement procedures, Dr. Vohra and

Vohra WPM created separate selective debridement and excisional debridement procedure

options in its EMR system.  However, the selective debridement option, and the training

surrounding the implementation of that option, was designed with the goal of displacing the least

amount of surgical excisional debridements possible rather than documenting and billing

debridement procedures correctly and based on patient needs.  Therefore, the design of Vohra

WPM's EMR system, along with the training provided to physicians by Vohra WPM, remained a

key factor in continuing to cause the submission of false claims, even after the EMR system was

changed to add the capability to document and bill for selective debridements.

168.    Defendants tried to prevent displacement in a few ways.  First, when Dr. Vohra

and Vohra WPM rolled out selective debridement in April 2023, they taught Vohra Companies

physicians that selective debridement was indicated for use only where excisional debridement

was not indicated, including in skin-depth wounds.  That instruction was received by a physician

workforce that had been trained for years that (surgical excisional) debridement was required for

essentially all subcutaneous, muscle or bone-depth wounds that contained any necrotic or

devitalized tissue to remove some or all of that tissue from the wound.  This directive had been

enforced through corporate wound debridement targets that exceeded 90 percent.  Vohra's

explanation of and training on the new selective debridement option did not change these instructions at all; they remained in place.

169.    Second, the EMR was programmed to reinforce this.  For example, the old "debridement" procedure screen was simply relabeled "excisional debridement." But in order to record a selective debridement in the EMR, a physician was required to pick a "Reason for No Excisional Debridement" from a drop-down menu of overly narrow choices.  This extra step – the need to justify why the physician was not doing an excisional debridement – reinforced that performing an excisional debridement was still preferred.

170.    Finally, Vohra WPM and Dr. Vohra only allowed Vohra physicians to perform selective debridements on patients who were not in "skilled status" (*i.e.*, on patients who were not in a SNF and not receiving benefits via a bundled payment to the facility).

171.    Vohra WPM did not allow its physicians to perform selective debridements on patients who were in a "skilled status" because Medicare would have rejected those claims; Medicare already paid for selective debridement procedures for those patients via the bundled payment to the facility.  This means that for a significant number of patients treated by Vohra physicians, every debridement continued to be billed as an excisional debridement.

172.    Dr. Vohra and Vohra WPM knew selective debridement can and should be performed beyond the limited scenarios its EMR allowed for, and beyond the limited scenarios it trained its physicians selective debridement was indicated.  Nonetheless, Vohra WPM designed the selective debridement option to ensure its limited use and avoid displacing the number surgical excisional debridements for which the Vohra Companies billed.

### iii.  Dr. Vohra and Vohra WPM Exerted Significant Pressure on Physicians to Maximize the Number of Debridements Performed

173.    Dr. Vohra was intensely and disproportionally focused on generating revenue.

174.     First, Dr. Vohra was able to realize immense personal financial benefit from the Medicare revenue the Vohra Companies generated.  The corporate structure and relevant operating agreements – including that VHS Holdings is an S corporation, which allows distributions to its owner – enabled Dr. Vohra to leverage Vohra WPM via loans and credit agreements and take out hundreds of millions of dollars from Vohra WPM and VHS Holdings between 2019 and 2023.

175.     Second, Dr. Vohra sought to sell Vohra WPM to private equity firms during the relevant time period.  Being able to show increasing corporate revenue equated to increasing corporate value and an increased purchase price.

176.     To drive his revenue goals, Dr. Vohra flipped the care model on its head.  The normal care model requires that patients' conditions inform what services physicians provide, that those services determine reimbursement amounts, and that drives revenue.  Dr. Vohra, however, set revenue goals that were disconnected from patient care, backed into whatever procedures and combinations of services would yield that revenue, and then placed intense pressure on Vohra physicians to perform those services.

177.     Dr. Vohra understood that surgical excisional debridements generated significant revenue.  Indeed, during the relevant time period, more than half of the Vohra Companies' revenue was derived from reimbursement for surgical excisional debridements.

178.     As a result, Dr. Vohra and Vohra WPM set corporate targets for the number of debridement procedures physicians were expected to perform, cloaked those targets under the guise of better patient care, and enforced them through various tools.

### 1.  Tools Used to Enforce Corporate Targets

179.     The Vohra Companies established various tools that purportedly monitored

physician performance but were, in fact, used as tools to enforce Vohra WPM's corporate expectations as to the number of debridement procedures Vohra physicians performed.  These tools closely tracked the number of debridements performed by the Vohra Companies' physicians and were used by Vohra WPM management to identify the physicians whose debridement numbers they wanted to increase.  These physicians were then subjected to intense "training" and pressure by Dr. Vohra, the CMO, the CFO, and Lead Physicians to increase their debridement numbers.

180.   The first such tool developed by Dr. Vohra and Vohra WPM was the Reference Index.  Dr. Vohra and Vohra WPM used the Reference Index to increase the volume of debridement procedures and other higher-revenue generating services it physicians performed.

181.   As of July 1, 2015, the Reference Index included the following requirements for Vohra physicians:

| | | |
|---|---|---|
| Subcutaneous Debridement | >15% | of total encounters |
| Muscle Debridement | >10% | of total encounters |
| Cauterization | > 5% | of total encounters |
| Initial Visit (not time based) | <60% | of total initial evaluation and management services |
| Straightforward Complexity Visit | <30% | of follow-up evaluation and management services |
| Biopsy of Skin or Wound | >0% | (No usage raises the concern of missed diagnosis) |
| Percent of Necrotic Wounds Debrided | >60% | (<60% implies failure to treat) |
| Services per Encounter (SPE) | >1.2 | (< 1.2 implies incomplete evaluation) |

182.   A physician's Reference Index score started at "0" and increased by one point for each category that the physician was outside of the specified range.  The ranges only listed a minimum threshold for debridement procedures and no upper limits.

183.   Dr. Vohra and Vohra WPM threatened to review physicians' privileges if the targets in the Reference Index were not met.  In his June 2017 Founder's Letter, Dr. Vohra

explained the Reference Index and stated that "[p]hysicians whose practice patterns and decision making fall outside of our standards will have their privileges reviewed/suspended."

184.    Initially, Dr. Vohra and Vohra WPM set the threshold for review of physicians' privileges at a Reference Index score of greater than 3, meaning the physician was outside of the target range on 3 or more of the metrics listed above.

185.    In 2016, Vohra WPM and Dr. Vohra suggested lowering the threshold that triggered review of privileges to a Reference Index score of 2, meaning a physician could only be outside of the target range on one of the metrics listed above if the physician wanted to avoid review.

186.    Simultaneously, Vohra WPM increased target percentages in the Reference Index to drive revenue.

187.    As of July 1, 2016, the Vohra Companies had revised the Reference Index to increase the target for percent of necrotic wounds debrided from greater than 60 percent to greater than 70 percent.  As outlined below, this metric ultimately rose to 91 percent by mid-2020 at the direction of Dr. Vohra.

188.    In or around September 2019, at the direction of Dr. Vohra, Vohra WPM retired the Reference Index and replaced it with a metric known as "RPE" (revenue per encounter). RPE measured the amount physicians were paid for each patient encounter based on the mix of services performed and for which Vohra received reimbursement.  A physician's overall RPE number was the average amount a physician was paid per patient encounter and was higher or lower based on the mix and volume of services billed.

189.    In his 2019 founder's letter, Dr. Vohra informed physicians that Vohra WPM's "medical leadership and training programs have developed to the next level.  We are retiring the

reference index (RI) tool in favor of more targeted auditing and training.  Statistics on best practice average code utilization will be provided on your compensation statements, so you can compare your practice pattern to that of the whole group."

190.  Vohra WPM updated its "Clinical Practice Guidelines" to reflect the new targets for physicians and included an RPE of greater than $45 per patient, per encounter.  Over time, Dr. Vohra increased the RPE target to $65 per patient, per encounter to further drive revenue and growth.

191.  Dr. Vohra transitioned from the Reference Index to RPE because Dr. Vohra wanted it to be easier for physicians to understand how their utilization of different procedures drove revenue and impacted their own pay.

192.  The Vohra Companies compensated its physicians on a fee-for-service basis based on a fee schedule established by Vohra WPM.   The more Medicare paid for the service, and the more revenue the Vohra Companies received for the service, the higher the physician was paid for that service.  For example, Vohra physicians were paid more for muscle or bone debridements than subcutaneous debridements.

193.  Each physician received a monthly compensation report similar to the example below from May 2020.

| Services | Count | Your Utilization | Utilization (Appropriate Clinical Practice Guidelines) | Compensation |
|---|---|---|---|---|
| Debridement SQ Tissue | 30 | 21.89% | 36% | $1,050.00 |
| Debridement SQ Tissue (secondary) | 7 | | | $120.00 |
| Debridement Muscle/Fascia | 23 | 13.61% | 26% | $1,275.00 |
| Debridement Muscle/Fascia (secondary) | 0 | | | $0.00 |
| Debridement Bone | 0 | 0.00% | 2% | $0.00 |
| Chemical Cautery | 21 | 12.43% | 18% | $480.00 |
| Chemical Cautery (secondary) | 0 | | | $0.00 |
| PEG Tube Replacement | 0 | | | $0.00 |
| **Procedure Subtotal: 81** | | | | **$2,925.00** |
| Skin Biopsy | 0 | 0.000% | | $0.00 |
| Wound Biopsy | 0 | 0.000% | | $0.00 |
| **Biopsy Subtotal: 0** | | **0.00%** | **0.5%** | **$0.00** |
| Initial Visit (Not Time Based) | 23 | 74.19% | 38% | $920.00 |
| Initial Visit (Time Based) | 7 | 22.58% | 42% | $420.00 |
| Initial Visit (Extensive Time Based) | 1 | 3.23% | 20% | $80.00 |
| **Initial Visit Subtotal: 31** | | **100.00%** | | **$1,420.00** |
| Straightforward Complexity | 16 | 17.20% | 10% | $320.00 |
| Low Complexity | 45 | 48.39% | 50% | $1,125.00 |
| Moderate Complexity | 30 | 32.26% | 36% | $1,050.00 |
| Time - Based Visit | 2 | 2.15% | 4% | $120.00 |
| **Follow Up Visit Subtotal: 93** | | **100.00%** | | **$2,615.00** |
| % Necrotic Wound Debrided | | 55.24% (58/105) | 91% | |
| % Encounters where both an EM and Procedure Billed | | 17.16% (29/169) | 22% | |
| % Encounters where more than one Procedure Billed | | 4.14% (7/169) | 16% | |
| **Total Services: 205** | | | | **$6,960.00** |
| Administrative Stipend Biltmore Consolidation Exam | | | | $500.00 |

| | | |
|---|---|---|
| **Adjustment Subtotal:** | | **$500.00** |
| **COMPENSATION:** | | **$7,460.00** |

| Utilization Metrics | Company Guidelines |
|---|---|
| Total Encounters: 169 | |
| Initial Encounters: 32 (18.93%) | 5 - 15% |
| Skilled Encounters: 121 (71.60%) | 15 - 50% |
| Non-Reimbursable Encounters: 0 (0.00%) | < 2% |
| Revenue Per Encounter: $41.18 | > $55.00 |

194.   The report was broken down by service type and showed the count and total paid for each service performed.  It also showed how the physician's performance measured against expectations across a range of metrics, including the physician's RPE.  The constant feedback on performance against expectations served both to drive behavior change (to increase revenue) and to reinforce Vohra WPM's utilization targets.  Ensuring that Vohra Companies physicians were meeting or striving to meet these targets, even as they increased over time, was critical to achieving Vohra WPM's escalating revenue goals.  For example, by the time of this report in

2020, Vohra WPM's target for percent of necrotic wounds debrided had risen from greater than 60 percent in 2016 to 91 percent.

195.   The ideal RPE number was based on a mix of the most profitable services that could be billed together.  Thus, a physician could easily review his or her RPE and see that, by doing one procedure over another, or mixing certain procedures together, the physician made more money.  The RPE did not consider physicians' specific patient populations or individualized needs of their patients.

196.   Dr. Vohra explained how the number and types of procedures could increase the physician's RPE.  Dr. Vohra explained how the "top" doctors understand to bill procedures at different levels, because if two procedures are billed at the same level, only "one code is generated for their payment."  But debridement procedures at different levels would generate two codes.  Additionally, Dr. Vohra explained a physician utilizing "cautery" would be able to submit "another procedure."  Dr. Vohra considered these two distinctions "the difference between making $55 per encounter and $65 per encounter."

197.   Initially, Dr. Vohra set the RPE target at $45 per patient encounter in 2019.  In an email dated May 20, 2019 to the CEO and CFO, Dr. Vohra explained his plan to increase the RPE target over time and the intended financial result.  Dr. Vohra described that doctors that were making $44 to $55 per encounter can be moved 0.5 square deviation to the right "with coaching and fine tuning."  He explained how that would give the Vohra Companies an average of just over $50 per encounter, and moving that 0.5 square deviation to the right gives Vohra WPM the goal of $55 per encounter.  Dr. Vohra further stated: "I propose this as the goal for the company," and noted that the CFO's goal was to raise the RPE by $1 every month so that Vohra WPM would reach its financial goal by year end. "The result will be a 10% pay increase" to the

doctors, and "10% revenue/ebitda growth contribution going into 2020."

198.   Dr. Vohra explained that physicians "who are making less than $40 per encounter are just doing it wrong," and ultimately suggested setting an RPE goal of $55 for the company. Dr. Vohra believed that a $55 RPE was achievable with "training and perhaps some sort [of] technology in the EMR."

199.   Ultimately, Dr. Vohra wanted "everyone over $55 [RPE]" but was willing to "take [a] $55 average [RPE] as step one."

200.   In accordance with Dr. Vohra's ambitions, the Vohra Companies set an overall RPE target of $55-$60 effective December 1, 2019.  In 2022, Dr. Vohra and Vohra WPM increased the RPE to $65 per patient encounter.

## 2.   Vohra WPM's Enforced Corporate Targets Were Driven by Revenue Goals, Not Patient Care

201.   Vohra WPM and Dr. Vohra focused on dollar amounts and driving revenue, not patient care, in setting the Reference Index and RPE requirements.  Dr. Vohra steadily increased the Reference Index and RPE target over time, and these increases were based on revenue goals, not patient care goals.

202.   As one Vohra physician noted, "[t]he Reference Index seemed to correlate with whether the provider was meeting the Vohra Companies' standards for billing rather than the standards for patient care" and "[m]eeting RI is sometimes an issue and more business oriented than clinical."

203.   Vohra physicians complained about the targets set by Vohra WPM, noting that they were not reasonable and their patients often did not require debridements at the rate required by Dr. Vohra.

204.   One physician informed his supervisor via email that, "with [his] patient

population, [he] is not even able to meet the regular debridement quotas" without over treating his patients.

205.    Lead physicians and medical directors also expressed concern about the increases to Vohra WPM's physician utilization targets over time and concluded they were tethered to financial goals rather than patient needs and clinical guidelines.

206.    Dr. Vohra shut down concerns that were raised to him, and instead, continued pushing the idea that more debridements equated to better patient care.

207.    Behind the scenes, however, Dr. Vohra himself acknowledged that RPE is "purely a result of targeted training" and directed the CFO to "remove reference to [RPE] improvement being related to better care" from shareholder communications.

208.    Various private equity firms that considered investing in Vohra during the relevant period expressed concerns to Vohra WPM about their business practices, including the internal pressure placed on physicians to debride more and provide higher acuity procedures and Vohra WPM's billing and coding practices surrounding selective versus surgical excisional debridement.

209.    In a December 2019 PowerPoint presentation titled "Private Equity Discussion & Opportunity Exploration Discussion Deck For Board Review," the CFO relayed concerns expressed by various private equity firms, which included "Utilization/Compliance (RPE climbing fast, controls, unsustainability)" and "RPE abuse."

210.    Several facilities with whom the Vohra Companies contracted also raised complaints and concerns to Vohra WPM regarding debridement procedures its physicians performed.

211.    On February 13, 2019, a facility administrator reported that the Vohra physician

documented that anesthesia was achieved using topical benzocaine and the patient's wound was debrided with a curette, but neither of these procedures were performed per the patient and the wound nurse.  When questioned, the Vohra physician stated that she debrided the wound but may have used the edge of a ruler to debride the soft tissue.  The Vohra physician also stated that the EMR system forces you to choose an ointment option for anesthesia, and she did not recall whether an anesthetic had actually been applied.  The Vohra physician further stated "that when explaining to the patient she may have not used the word debridement but rather cleaning the wound."  Despite this information, Vohra WPM concluded that no compliance issue was found.

212.    On October 1, 2018, the Director of Nursing and the Administrator of a facility in California reported concerns to Vohra WPM about its physician's practice patterns.  The summary of this complaint prepared by Vohra WPM stated that the "main issue is over debridement and not performing debridement properly (bleeding/pain management issues)."

213.    On October 31, 2018, the Administrator of a facility in Texas reported concerns to Vohra WPM that its physician was "too aggressive."

214.    Patients also expressed concerns that they did not receive the services for which they were billed. For example, on March 29, 2019, a patient reported to Vohra WPM that the services she received "were limited to bedside consultation, wound measurements and autolytic treatment directives provided to the facility staff only and that some of the services billed were not provided."  Despite this information, Vohra WPM concluded that no compliance issue was found.

215.    Vohra WPM did not have an effective compliance function and lacked a compliance department.  Dr. Vohra rejected recommendations from employees and outside consultants to create a compliance department and ignored or shut down concerns about

43

overutilization of debridement procedures and RPE abuse.

### 3. The Vohra Companies' Hierarchy Was Designed to Reinforce the Primacy of the Reference Index and RPE and Ensure Compliance with Corporate Requirements

216.   Dr. Vohra and the CMO appointed Lead Physicians who served as intermediaries between line physicians and Vohra WPM management.  Dr. Vohra and the CMO personally mentored Lead Physicians to enforce Vohra WPM's corporate targets and expectations.  As Dr. Vohra explained to a recently appointed Lead Physician on January 29, 2017, "I want you to be the champion of company initiatives regardless of personal opinion.  This means full engagement and alignment with physician leadership."

217.   Physicians that had low References Indexes and high RPE scores – *i.e.*, those who performed a high number of debridements – were promoted to supervisory positions.

218.   Vohra WPM also provided financial incentives to Lead Physicians as further impetus to enforce compliance with corporate targets, including bonuses for increasing the number of services its physicians performed and bonuses for increasing the percentage of debridements performed.

219.   Physicians were trained on the company's enforced expectations regarding revenue and volume of debridement procedures and on how to monitor their own compliance with those expectations.  Vohra WPM controlled how its physicians delivered wound care with constant, visible, real-time reminders to physicians of their progress towards corporate-set revenue and procedure volume goals both within its proprietary EMR system and its practice management software, which is integrated with the EMR.  Lead physicians tracked these same metrics and became Vohra WPM's voice to make them compulsory.

220.   The Vohra Companies' Lead Physicians understood that their primary role was to

ensure that their supervised physicians' Reference Indexes and RPE numbers met the corporate targets.  The position description specified that Physician Leads are "directly responsible for the coordination of the training completion, oversight and monitoring of physicians performance and correction of aberrant physician practice patterns.  He/She reports directly to the Chief Medical Officer and also works closely with the regional practice manager."  The position description also specified that one of the ways Lead Physicians should monitor physician performance is "through review of Monthly FFS [fee-for-service] reports," and they should implement corrective action plans as needed.

221.    Lead Physicians regularly communicated with the physicians they supervised about their Reference Index and RPE numbers through weekly calls, emails and meetings.  Dr. Vohra and the CMO frequently participated in these meetings, including standing monthly meetings to review physicians compliance with Vohra WPM's corporate targets.  Lead Physicians also rounded with physicians they supervised in an effort to increase their utilization and change practice patterns to meet corporate targets.

222.    Lead Physicians were expected to closely monitor physicians' Reference Index and RPE scores.  As one Lead Physician explained to a physician she supervised, "I am charged with the task of assisting you with keeping your RI [Reference Index] numbers in compliance."  She stated that being "on good footing" with respect to the Reference Index "requires frequent examination of the numbers throughout the month" and provided advice based on her own practice: "I, for one, take a look at my RI [Reference Index] on a daily basis so that I can constantly adjust my practice.  This avoids the risk of being so far outside of the parameters at the end of the month that I can't correct things."

223.    Lead Physicians also reminded the physicians they supervised that they would be

rewarded and incentivized for meeting corporate expectations.  In 2016, Dr. Vohra established a policy whereby Vohra WPM provided payments to the physician equal to the amount of the physician's liability insurance only if the physician achieved a Reference Index score of 0 or 1. In one email from a Lead Physician to the physicians she supervised, the Lead Physician established a monthly check in regarding their Reference Index scores and stated that "we are trying hard to focus on these values as Dr. Vohra mentioned in his Founders Letter 2016, 'On March 12, 2017, payments will be made to 'recognized' physicians equal to the amount charged for liability insurance….' Please review the criteria listed in Dr. Vohra's letter in order to be a 'recognized' physician.  I want all of you to be eligible for this."  The CMO complimented the Lead Physician stating "[v]ery nice email."

224.   During performance/peer reviews with line physicians, Lead Physicians focused on whether the physician's performance was satisfactory by whether the physician had an adequate Reference Index score or RPE, not by whether the physician was adequately addressing patient needs.  For example, in one chart review, the comments section read: "There is no clear evidence of underdebridement from [the reviewed physician's] charts however her reference index indicates that she may be less aggressive than perhaps she should be."

225.   Lead Physicians were expected to implement disciplinary action for physicians that failed to meet the corporate targets outlined in the Reference Index and RPE, including probation and referring such physicians to Vohra WPM's executive team for further action.

226.   Dr. Vohra and the CMO did not delegate all responsibility for enforcing corporate targets to Lead Physicians.  They too closely monitored Vohra WPM's data to identify physicians whose utilization was not in line with company targets.  Dr. Vohra and the other members of the executive team then directed Lead Physicians (or, at times, other physicians that

performed high numbers of debridement procedures) to mentor doctors that performed lower volumes of debridement than was required by the targets set by Vohra WPM.

227.    For example, in an email dated October 23, 2018, the CMO informed a Vohra physician that he had identified eleven physicians who needed "mentorship relating to low muscle debridement."  The CMO asked for her assistance and instructed her to "be gentle at first but firm in the need to get them in range."

228.    That same day, the CMO emailed another Vohra physician explaining that several doctors are "in need of mentorship relating to low sub Q debridement."  The CMO asked for his assistance, offered to pay him $200 per mentee, and also provided the instruction to "be gentle at first but firm in the need to get them in range."

229.    Neither email contained a request or instruction to review patients' medical records, to determine whether the services provided were necessary or appropriate, or to understand why the flagged physicians' debridement numbers were lower than the targets set by Vohra WPM.

230.    In June 2019, Dr. Vohra started requiring physicians to undergo weekly 15-minute "trainings" until they achieved the desired RPE and were compliant with the various increases to Vohra WPM's corporate targets.  Dr. Vohra described this training as "intense coaching."  Upon reaching the RPE goal, trainings would occur monthly to ensure RPE would continue to meet or exceed the goal Dr. Vohra set.  If a physician successfully maintained the required RPE for two months, "training" would be "considered complete."

231.    In one instance, Dr. Vohra instructed the CFO to "unleash Blom [a lead physician with a very high RPE]" until the doctor being "mentored" got his RPE over the expected number.  In that same June 2019 email, Dr. Vohra further instructed the CFO that Vohra has

"20% more revenue to get from this initiative so staff it well and make it a priority. The goal is to get this 20% by year end."

232.    Dr. Vohra also created a "Mentor Program" in 2019.  Dr. Vohra charged the Chief Financial Officer (CFO) with implementing the Mentor Program even though he had no medical or clinical background.  Dr. Vohra required the CFO to report RPE numbers weekly to him so that Dr. Vohra could track doctors' utilization.

233.    Dr. Vohra instructed the CFO to review RPE with individual physicians and explain to them how increasing their RPE would result in higher pay.

234.    The Mentor Training Guide associated with this program included a loose script wherein the Mentor/CFO began by explaining "we have arranged for a peer clinician to go over your statistics to see if there is an area where you could be providing a higher level of care which may result in higher earnings.  BTW, if your RPE were at the same level as the average of your peers, you would have earned $XXX more last month."

235.    Physicians who failed to achieve the desired RPE were subject to negative consequences.  Dr. Vohra instructed the CFO and Chief Executive Officer (CEO) to put the physicians on probation, take their assigned facilities away, and/or place them on the TFR (target for replacement) list and, ultimately, terminate them.

236.    In an email dated December 27, 2019, the CEO circulated a list of physicians who were within the "bottom quintile" of RPE within the Vohra Companies, and he stated that they must "get out of the bottom or we drop them."  In response, Dr. Vohra agreed that most physicians could be replaced.

237.    Likewise, on May 27, 2020, the CFO sent Dr. Vohra a proposal that physicians within the bottom 10 percent of RPE would face a reduction in facilities that the physician

serviced or possible termination.  Indeed, Vohra WPM established a list known as the TFR (target for replacement) list.  Dr. Vohra advised executives, including the CFO and CEO, to place physicians who had low RPE scores and were not responding to the intense coaching on the TFR list.  The goal was to find a replacement for the low-performing physician so there would not be a gap in service or billing, then terminate the low-performing physician once a replacement was identified.

238.    In sum, Vohra physicians were trained to do a debridement procedure on every wound that had any amount of necrotic or devitalized material, no matter how little material there was in the wound, and no matter how the wound was healing.  Vohra WPM hard-coded this directive into the screens the physicians used to enter the services they provided to patients in the EMR and required physicians to debride the wound if they listed any percentage of devitalized material in the wound bed.  Mandatory debridement was also reinforced by ensuring the physician entered almost no information about the procedure actually performed; Vohra WPM's EMR asked only for tissue, type of instrument, type of anesthesia and post-procedure depth of wound, and did so largely from drop down menus with only a few choices.  And mandatory debridement was enforced through corporate performance metrics, which were constantly reinforced through real time updates of a physician's performance against the metrics in the EMR and in the physician's monthly compensation reports.

239.    This scheme worked.  Week after week, Vohra WPM caused the Practice Entities to bill for surgical excisional debridements that were not reasonable and medically necessary and, in many instances, were upcoded selective debridements.

240.    Federal regulations require that claims are only submitted for medically necessary services and that accurate CPT codes are used, and these requirements are material to the

Government's decision to pay claims.

241.   Medical necessity is so central to Medicare claim reimbursement that it is designated as a condition of payment for the Federal Health Care Programs.  42 U.S.C. § 1395y(a)(1)(A); see also 42 C.F.R. § 424.24(g)(1) (requiring Part B providers to certify that services are medically necessary).

242.   Accordingly, a reasonable person would know that Medicare would not pay for claims that were not medically necessary, including claims submitted with inaccurate, unsupported, and upcoded CPT codes.  And here, Vohra WPM and Dr. Vohra had actual knowledge that Medicare would not pay for such claims.

### iv.   Examples of Medically Unnecessary and Upcoded Claims for Surgical Excisional Debridement

243.   *Medicare Beneficiary 1*.  On January 11, 2024, the Vohra Companies treated Medicare Beneficiary 1, an 89 year-old male patient, at his bedside.  The Vohra Companies billed Medicare for a surgical excisional debridement of muscle-level tissue using CPT code 11043.

244.   A photograph of the wound taken by non-Vohra personnel on January 10, 2024 – the day before the purported procedure – shows that (a) the skin is intact, (b) muscle-level tissue is not exposed, (c) there is no necrotic tissue, and (d) there is not even demarcation of wound edges.



245.     A photograph of the wound taken by non-Vohra personnel on January 12, 2024 –
the day after the purported surgical excisional debridement – show that the skin from two days
prior remains intact, and there is no evidence of a surgical excisional muscle level debridement
being performed the day prior.



246.     Moreover, leading up January 11, 2024, the Vohra Companies' billed Medicare
for 55 surgical excisional debridements for this beneficiary, both at the subcutaneous (CPT code
11042) and muscle (CPT code 11043) levels, nearly every week, for the entire previous year.

247.     The Vohra Companies continued billing for surgical excisional muscle level
debridements for Medicare Beneficiary 1 for each of the five consecutive weeks after the January
11, 2024 date of service.

248.     *Medicare Beneficiary 2*.  On January 11, 2024, the Vohra Companies treated
Medicare Beneficiary 2, a 96 year-old female patient, at her bedside.  The Vohra Companies
billed Medicare for a surgical excisional muscle level debridement using CPT code 11043.

249.     A photograph taken by non-Vohra personnel on January 10, 2024, shows that the
day before the procedure, the wound appears to be a relatively innocuous venous insufficiency
ulcer, and the wound bed lacks characteristics that would necessitate performing a surgical
excisional debridement.



250.    A photograph taken by non-Vohra personnel on January 12, 2024 – the day after the procedure – shows that a surgical excisional muscle level debridement was not performed the day prior on this wound.



251.    Moreover, leading up to January 11, 2024, the Vohra Companies' billed Medicare for 47 surgical excisional debridements for this beneficiary, both at the subcutaneous (CPT code 11042) and muscle levels (CPT code 11043), nearly every week, for six months prior.

252.    *Medicare Beneficiary 3*.  The Vohra Companies submitted claims for surgical

excisional debridements on wounds that were already improving or shrinking, on a repetitive and extended basis, including for palliative patients where surgical excisional debridement is only appropriate in limited circumstances such as management of pain, odor, or infection.

253.    The patient medical records generated by Vohra WPM's EMR describe using surgical excisional debridement to remove implausibly tiny pieces of tissue from a wound, which in some cases were smaller than the instrument reportedly used to perform the debridement, and to remove the same level of necrotic tissue for multiple weeks in a row even though the wound was reportedly debrided down to "healthy bleeding tissue" each week.

254.    For example, Medicare Beneficiary 3 was an 89 year-old female that was referred to the Vohra Companies for treatment of a sacral wound caused by moisture-related skin breakdown that was not severe enough to be considered a pressure injury at the time of the initial referral.

255.    The Vohra Companies submitted claims for thirty-eight surgical excisional debidements of this wound for Medicare Beneficiary 3 between July 7, 2017 and November 10, 2017 and December 13, 2018.

256.    During the first month that the Vohra Companies treated Medicare Beneficiary 3's sacral wound, the wound remained small.   During this month, the Vohra Companies billed Medicare three times for surgical excisional debridement procedures to remove minute amounts of necrotic tissue: 0.10-0.09 square centimeters, the size of a grain of sugar.

257.    The wound then devolved until – six weekly debridements later – the Vohra Companies reclassified the wound as a Stage IV pressure injury and changed Medicare Beneficiary 3's treatment goal from healing the wound to palliation.   Despite the change of treatment goal, the Vohra Companies medical record documentation indicates no change in the

apparent treatment of Medicare Beneficiary 3's wound, and the physician continued weekly debridements.

258.    The Vohra Companies EMR billed Medicare for eighteen more surgical excisional debridements of Medicare Beneficiary 3's wound over five months, and then after a break for several months, for another ten surgical excisional debridements through December 13, 2018.  In the end, the Vohra Companies submitted claims for twenty-eight surgical excisional debridement of Medicare Beneficiary 3's wound after the treatment goal for the wound had been changed from healing to palliation.

259.    With respect to Medicare Beneficiary 3's sacral wound, the medical record reflects removal of only tiny amounts of tissue in consecutive weeks.  The medical record also reflects that the wound contained the exact same amount of necrotic tissue week after week.  Nonetheless, the EMR generated procedure notes each week claiming all of these were repetitive surgical debridements that removed 100 percent of the necrotic tissue, down to healthy bleeding tissue, every time.

260.    Thus, at a minimum, the claims submitted for dates of service December 14, 21, and 28, 2017, for surgical excisional subcutaneous level debridements using CPT code 11042 for Medicare Beneficiary 3 were false.

261.    *Medicare Beneficiary 4*.  Medicare Beneficiary 4 was a 73 year-old male that the Vohra Companies treated for a post-surgical wound to the left chest, a post-surgical wound to the left first toe, and a diabetic wound to the left distal toe.

262.    The Vohra Companies submitted claims to Medicare for twenty-one surgical excisional debridements for Medicare Beneficiary 4 between October 31, 2018 and August 16, 2019, nineteen of which were for the left first toe.

263.     With respect to Medicare Beneficiary 4's wounds, the medical records reflect surgical excisional debridements being performed on wounds with very small amounts of devitalized tissue that either remained the same size week over week, or were improving and shrinking in size in comparison to previous weeks.  The medical records also reflect that the wound contained the exact same amount of necrotic tissue week to week (even though the EMR generated procedure notes claiming that 100 percent of the necrotic tissue was removed, down to healthy bleeding tissue, every week), and that the physician used "pickups" (tweezers) rather than a sharp instrument to perform the procedure.

264.     The Vohra physician also documented performing weekly debridements for months to remove the same miniscule amounts of tissue from the left first toe wound.  Medicare Beneficiary 4's medical records reflect performing surgical excisional debridement procedures to remove 0.05 square centimeters of tissue each week for six consecutive weeks, then to remove 0.04 square centimeters of tissue for the next three consecutive weeks, and finally to remove 0.02 square centimeters of tissue for the next seven consecutive weeks.  An object that is two tenths of a millimeter on each side is smaller than a grain of sand.  The Vohra Companies billed Medicare for sixteen surgical excisional debridement procedures to remove a fraction of a grain of sand over and over and over again.

265.     Thus, at a minimum, the claims submitted for dates of service April 9, 2019, through August 6, 2019, for fourteen surgical excisional debridements of subcutaneous level tissue of Medicare Beneficiary 4's left foot using CPT code 11042 were false.

266.     *Medicare Beneficiary 5*.  Vohra WPM programmed its EMR to automatically insert clinically relevant information, without input from the physician, in an attempt to support its surgical excisional debridement claims.  For example, the EMR is programmed to assume that

55

physicians always remove 100 percent of the necrotic or devitalized tissue from a wound during each and every debridement.  But instead of asking physicians to enter or confirm this information, the EMR automatically inserts the amount of necrotic or devitalized tissue *present* in the wound that the physician entered, as the amount of necrotic or devitalized tissue *removed* from the wound, and then uses this automated and unsupported information to generate claims to Medicare.

267.    From June 22, 2018 to July 27, 2018, the Vohra Companies submitted claims for six surgical excisional debridements of a Stage IV sacral pressure injury for Medicare Beneficiary 5, a 71 year-old male patient.  The wound ranged in size from 90 square centimeters at the outset of this treatment to 108 square centimeters at the conclusion of treatment.  Each week, the physician documented that 100 percent of the wound was covered with adherent necrotic and devitalized tissue, but the physician did not record how much of that tissue was actually removed.

268.    Instead, the EMR automatically inserted that 100 percent of the necrotic tissue was removed from the wound (*i.e.*, that depending on the date of service, between 90 and 108 square centimeters was debrided), without input from the physician, and automatically billed Medicare for add-on codes based on that made-up information.  The Vohra Companies submitted claims to Medicare for the base surgical excisional debridement of muscle level tissue (using CPT code 11043, which covers the initial 20 square centimeters) plus the muscle level add-on CPT codes (11046) for each additional 20 square centimeters of tissue supposedly removed beyond the initial 20 square centimeters.  Vohra WPM's EMR essentially invented a number, put it in the medical record, and billed Medicare extra based on it.  Vohra WPM and Dr. Vohra programmed the EMR to do exactly this, generating false records and statements to support

Beneficiary 5's surgical excisional debridement add-on codes, and for potentially thousands of other claims that were generated the same way.

269.    *Medicare Beneficiary 6*.  The fraudulent nature of Vohra WPM's EMR is exemplified by how the Vohra Companies' EMR system documented and billed for biofilm-only debridements.

270.    No later than the end of 2019, Dr. Vohra and Vohra WPM implemented what they saw as a new way to generate even more revenue: surgical excisional debridements to remove biofilm only, even when there was no necrotic tissue or slough in the wound.

271.    Biofilm is a community of microorganisms, such as bacteria, that are attached to each other and often embedded in a matrix of sugar and proteins.  Biofilm is invisible, it cannot be detected using diagnostic tools available for use at bedside, and it is not dead or devitalized tissue.

272.    Biofilm inhibits wound healing and debridement may be indicated in certain scenarios where the presence of biofilm is suspected.  However, the suspected presence of biofilm alone does not automatically indicate performing a surgical excisional debridement of a wound.

273.    Nonetheless, Vohra WPM wanted the Practice Entities to bill for more surgical excisional debridements and increase revenue, so Vohra WPM used its EMR to drive forward the biofilm-only debridement initiative.

274.    It did so by making one change to the data entry screen that physicians used to document the description of the wound bed – adding the question "Biofilm Present?" with a check box for "Yes" or "No " and programming new form language for the medical record.  Just as the EMR did with the debridement procedure data entry, the EMR for biofilm-only

debridements asked for very little clinical information from the treating physician, instead inserting pre-programmed statements falsely framed as clinical observations by the physician about the specific procedure, the reason for the procedure, and descriptions of what the physician did during the procedure.

275.    For example, Medicare Beneficiary 6 was a 92 year-old male patient with a pressure injury on his left heel.  On October 30, 2019, his medical record describes a 15.75 square centimeter wound entirely covered with necrotic tissue.  By January 29, 2020, Medicare Beneficiary 6's medical record describes a much smaller wound, 1.2 square centimeters, and a much improved wound bed, covered entirely in granulation tissue. The presence of granulation tissue is a sign of wound healing, signaling that the wound is progressing – or has progressed – out of the inflammatory phase and into the proliferative phase of healing.

276.    Nonetheless, Medicare Beneficiary 6's medical record shows that starting on January 29, 2020, Vohra Companies performed three consecutive biofilm-only surgical excisional debridements on this wound.[2]

277.    The procedure notes for these surgical excisional debridements state that in order to "surgically excise" (automated language inserted by the EMR, not the physician) all of the invisible biofilm from the entire wound surface, the physician cut out healthy subcutaneous tissue as well, taking the wound bed back to "healthy bleeding" (automated language inserted by the EMR, not the physician).

278.    In other words, according to the procedure note, the physician took a wound that

---

[2] Vohra WPM programmed the EMR to assign the ICD-10 code Z87.2 as a secondary diagnosis when physicians performed biofilm-only surgical excisional debridements.  Although ICD-10 code Z87.2 (Personal history of diseases of skin and subcutaneous tissue) is not intended to be used to signify biofilm-only debridements, Vohra WPM applied it to claims in order to track physicians' performance of these procedures.

had taken months to get to the point where it was all granulation tissue and healing appropriately, just to rip it out, plus some healthy tissue, all to take the wound back to square one of the healing process – a "healthy bleeding" wound bed.  The physician did not write or insert this description of the procedure into the EMR – instead the EMR was programmed to insert this fabricated information to generate a record that would look like a surgical excisional debridement in the event of an audit.

### V.   The Vohra Companies Inappropriately Billed for Non-Covered Evaluation and Management Services

279.   Vohra WPM also increased revenue by inappropriately appending Modifier 25 to patient encounters.

280.   As discussed above, Medicare rejects claims for separate E&M claims billed on the same day as a surgical excisional debridements because global surgical packages already include payment for an examination.  However, where a "significant and separately identifiable" service is provided in addition to the surgical excisional debridement, and the separate service is significant enough to independently support billing an E&M claim (*i.e.*, the separate problem requires its own history, exam, and medical decision), the provider can add a Modifier 25 to the E&M claim and Medicare will pay it.

281.   Vohra WPM turned the exception into the rule and added Modifier 25 to nearly all "examinations" of non-debrided wounds when the physician performed a surgical excisional debridement.

282.   Vohra WPM programmed its proprietary EMR system to (1) assign a unique identifying number to each wound treated or evaluated, and (2) have a pop-up box appear during each patient encounter for each identified wound that required the physicians to enter a note as to the status of the wound until it was marked as fully resolved.

283.    When a Vohra physician performed a surgical excisional debridement, this programming would require the physician to also look at the patient's other non-debrided wound(s) and make a notation with respect to such wounds.  This notation – regardless of the amount of work performed (if any) – would *automatically* generate an E&M claim with Modifier 25.

284.    While prompting doctors to check on previously identified issues is not problematic, the manner in which the EMR system automatically generated claims as a result of the physician's notation *is* problematic.  The EMR system did not take into account the level of work performed (or not performed) on the non-debrided wound and whether the evaluation of the non-debrided wound was significant and separate.

285.    Because Medicare requires the problem to be separate *and significant* to use Modifier 25, incidentally noting a problem in the course of a debridement procedure cannot justify use of Modifier 25.

286.    As one NGS Article regarding Modifier 25 explains, an E&M claim billed with Modifier 25 should be able to stand alone as a medically necessary billable service.  The Article describes an example where an established patient is seen in the office for debridement of the patients' nails.  In the course of examining the feet prior to the procedure, Tinea Pedis (commonly referred to as "athlete's foot") is noted, and the physician recommends continued use of the previously prescribed topical cream.  The Article explains that this illustrates an inappropriate use of Modifier 25 because "the Tinea was noted incidentally in the course of the evaluation of the mycotic nail and did not constitute a **significant** and separately identifiable E/M service above and beyond the usual pre and postcare associated with nail debridement."  *See Modifier 25*, National Government Services, Inc.: Medicare Topics (Oct. 16, 2024),

https://www.ngsmedicare.com/web/ngs/modifiers?selectedArticleId=1636016&lob=96664&stat e=97178&rgion=93623 (emphasis in original).

287.    NGS sent this information directly to Vohra WPM's COO in November 2018 in connection with ongoing conversations relating to medical reviews of Vohra physicians.

288.    Vohra WPM and Dr. Vohra were aware of the Medicare rules surrounding Modifier 25 and the problematic claims generated by its EMR system.

289.    Vohra WPM's understanding of the correct Modifier 25 standard dates back to at least 2014.  In April 2014, the CMO responded to a physician's question relating to the EMR system and noted that, in order to be reimbursed, an E&M on the same day as a surgical excisional debridement must be separate and distinct from the problem for which the procedure was done, *and* it "also must justify payment in terms of medical complexity and significant work in addition to the procedure."

290.    Similarly, in February 2015, Vohra WPM's COO summarized an outside audit and explained to Vohra's CIO (who led the EMR development) that Modifier 25 was not supported where there were "no significant changes in patient's condition, no new complaints, no changes in treatment plan."

291.    Despite this understanding, Vohra programmed its EMR system to automatically generate E&M claims with Modifier 25 whenever a physician made any note as to a separate wound or issue on the same day the physician performed a surgical excisional debridement.

292.    On January 12, 2016, the CIO informed a physician that "you basically produce [an E/M visit with a Modifier 25] automatically if you do a procedure and there are other wounds on which you do not…."

293.    On June 1, 2016, Dr. Vohra advised the CIO that Vohra WPM "should also figure

out a way to stop generating an [E&M claim] unless it is meaningful" because "currently the drs cannot stop [E&Ms] from being generated."

294.   Over three years later, in June 2019, Vohra WPM's EMR system continued to automatically bill improper E&M visits that should not have been paid.

295.   In an email exchange between the COO, the CIO, and a lead physician, they discussed a hypothetical situation involving a patient with three wounds.  In the example, the physician performed muscle level surgical excisional debridements on two of the patients' wounds but made no changes to the third wound, which was stable.  The COO informed the lead physician that, per the CIO, "[the] more recent emr version [would] allow this to bill a low [E&M visit]."

296.   When the lead physician asked if this meant that "a single unaddressed wound w[ould] automatically trigger a [E/M code] when billed alongside a[nother code]," the COO responded: "That is what [the CIO] tells me is current logic."

297.   In September 2019, Vohra WPM hired an outside expert to review patients' charts in connection with Vohra's billing of E&M claims with Modifier 25.  Vohra WPM's expert reviewed a total of 2,201 E&M claims and found that "the error rate associated with only E/M services billed incorrectly with modifier 25 is 30.85%."  The expert stated he used "*de facto* scoring methodologies commonly applied in the coding industry" in the course of his review.

298.   Senior management, including Dr. Vohra, received a summary report with the results of the audit, yet did not return any overpayments or take immediate steps to correct the EMR system.

### i.  Examples of False Claims With Modifier 25 Improperly Appended

299.   *Medicare Beneficiary 7*.  The Vohra Companies submitted a false and fraudulent

E&M claim with Modifier 25 for Medicare Beneficiary 7 on date of service July 16, 2019. For this date of service, the EMR reflected that the Vohra physician performed a surgical excisional debridement on a wound on Medicare Beneficiary 7's left heel. During the same encounter, the EMR reflected that the Vohra physician performed an evaluation of a wound on Medicare Beneficiary 7's right foot for the tenth consecutive week.

300.    The Vohra physician documented no change to the wound from the previous visit, just as was the case on the four consecutive visits prior to July 16, 2019. In other words, the Vohra physician noted no change to the wound on Medicare Beneficiary 5's right foot for five consecutive visits.

301.    During the July 16, 2019 encounter, the Vohra physician made no changes to the treatment plan for the wound on Medicare Beneficiary 7's right foot, which consisted of applying betadine once daily. No changes were made to the treatment plan in the four previous visits leading up to this date of service.

302.    The Vohra Companies billed Medicare for the surgical excisional debridement of the wound on Medicare Beneficiary 7's left heel using CPT code 11042. Vohra also billed Medicare for a separate E&M service for the wound on Medicare Beneficiary 7's right foot using CPT code 99308 with Modifier 25 appended.

303.    *Medicare Beneficiary 8*.  The Vohra Companies also submitted a false and fraudulent E&M claim with Modifier 25 for Medicare Beneficiary 8 for date of service August 29, 2019. On this date of service, the EMR reflected that the Vohra physician performed a surgical excisional debridement of a sacral wound. During the same encounter, the EMR reflected that the Vohra physician performed an evaluation of a wound on patient Medicare Beneficiary 8's left, medial toe for the 3rd consecutive week.

304.     The Vohra physician documented that the left, medial toe wound had improved from the physician's prior visit. Although the wound was documented to be the same size as the prior week at 0.52 square centimeters, the wound had a scab on August 29, 2019.

305.     The physician made a nonmaterial change to the treatment plan. Specifically, the physician ordered that a triple antibiotic ointment no longer needed to be applied to scab. The physician then performed an E&M for the next 6 consecutive weeks, noting improvement of the scab each from 0.4 square centimeters through its resolution.

306.     For the surgical excisional debridement of Medicare Beneficiary 8's sacral wound, Vohra billed Medicare using the CPT code 11042. For the evaluation of the left medial toe, Vohra billed Medicare using CPT Code 99308 with Modifier 25 appended.

## Count I
### False Claims Act: Presentation of False Claims
### (31 U.S.C. § 3729(a)(1)(A))

307.     The United States repeats and realleges paragraphs 1 through 306 above, as if fully set forth herein.

308.     During the time period between December 5, 2017 and the present, Vohra WPM and Dr. Vohra knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment to Medicare for unreasonable and unnecessary surgical excisional debridements and E/M visits.

309.     Medicare would not have reimbursed the Vohra Companies for these false and fraudulent claims had they known that the surgical excisional debridements and E/M visits were not medically necessary and that, in many instances, they were non-surgical debridements that had been upcoded to surgical excisional debridements.

310.     Vohra WPM and Dr. Vohra presented or caused to be presented these claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

311.     Because of Vohra WPM's and Dr. Vohra's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $13,946 and up to $27,894 for each violation.

### Count II
### False Claims Act: False Statements
### (31 U.S.C. § 3729(a)(1)(B))

312.     The United States repeats and realleges paragraphs 1 through 306 above, as if fully set forth herein.

313.     During the time period between December 5, 2017 and the present, Vohra WPM and Dr. Vohra knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), including creating medical records with what appeared to be clinical observations but was actually language automatically populated by Vohra's proprietary EMR system that the Vohra physicians did not actually enter.

314.     Vohra WPM's and Dr. Vohra's false records and statements were made for the purpose of ensuring that Medicare paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Vohra WPM's and Dr. Vohra's statements and actions.

315.     The false records and statements made or caused to be made by Vohra WPM and Dr. Vohra were material to the payment of the false claims by the United States.

316.     The false records or statements were made with actual knowledge of their falsity,

or with reckless disregard or deliberate ignorance of whether or not they were false.

317.    Because of Vohra WPM's and Dr. Vohra's acts, the United States sustained

damages in an amount to be determined at trial, and therefore is entitled to treble damages under

the False Claims Act, plus civil penalties of not less than $13,946 and up to $27,894 for each

violation.

**Count III**
**Unjust Enrichment**

318.    The United States repeats and realleges paragraphs 1 through 306 above, as if

fully set forth herein.

319.    During the time period between December 5, 2017 and the present, the United

States paid the Vohra Companies for surgical excisional debridements and E/M visits when that

level of care was either not provided or was not necessary nor reasonable.

320.    By directly or indirectly obtaining federal funds from Medicare to which they

were not entitled, Dr. Vohra, Vohra WPM, and VHS Holdings were unjustly enriched at the

expense of the United States, and are liable to account and pay to the United States such

amounts, or the proceeds therefrom, which are to be determined at trial and which, under the

circumstances, in equity and good conscience, should be returned to the United States.

**PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in favor of

the United States as follows:

1.    On the First and Second Counts against Vohra WPM and Dr. Vohra, under the

False Claims Act, for the amount of the United States' damages, trebled as required by law, and

such civil penalties as are required by law, together with all such further relief as may be just and

proper.

2.      On the Third Count for unjust enrichment against Vohra WPM, Dr. Vohra, and

VHS Holdings for the damages sustained and/or amounts by which Defendants were unjustly

enriched or amounts by which Defendants retained monies received from reimbursements paid

by the United States to which they were not entitled, plus interest, costs, and expenses.

3.      All other relief as may be required or authorized by law and in the interests of

justice.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a

trial by jury on all issues so triable.

Dated:  April 3, 2025

*Respectfully Submitted*,

**YAAKOV M. ROTH**
**ACTING ASSISTANT ATTORNEY GENERAL**

s/ *Kirsten V. Mayer*
JAMIE ANN YAVELBERG
ANDY M. MAO
KIRSTEN V. MAYER
ATTORNEYS, CIVIL DIVISION
Commercial Litigation Branch
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-2335
Special Bar No. A5503349
Email: Kirsten.Mayer@usdoj.gov

**HAYDEN P. O'BYRNE**
**UNITED STATES ATTORNEY**

s/ Christopher Cheek
CHRISTOPHER CHEEK
ASSISTANT U.S. ATTORNEY

99 N.E. 4th Street, 3rd Floor
Miami, Florida 33132
Telephone: (305) 961-9001
Florida Bar No. 91363
Email: Christopher.Cheek@usdoj.gov


_s/ Ryan C. Grover_
RYAN C. GROVER
SPECIAL ASSISTANT U.S. ATTORNEY
Post Office Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422
Special Bar No. A5503343
Email: Ryan.Grover@usdoj.gov