UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:25-cv-21570-RKA

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

DR. AMEET VOHRA; VOHRA WOUND
PHYSICIANS MANAGEMENT. LLC;
AND VHS HOLDINGS, P.A.,

      Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS AND**
**<u>MEMORANDUM OF LAW IN SUPPORT THEREOF</u>**

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Defendants Dr. Ameet Vohra ("Dr. Vohra"), Vohra Wound Physicians Management, LLC ("Vohra WPM"), and VHS Holdings, P.A. ("VHS Holdings") (collectively, "Defendants"), through undersigned counsel, hereby move to dismiss the Complaint filed by the United States (the "Government").

## SUMMARY OF ARGUMENT

The Complaint resembles exactly what one would expect from a False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), case driven not by an insider's discovery of fraud but by the Government's mining of Medicare claims data in order to reverse-engineer FCA liability.  To be clear, there is no whistleblower, nor cooperator to serve as the Government's advocate here.  No complaining employee or medical provider.  No industry competitor.  There is only the Government's claim that billing frequency somehow equates to medical upcoding.  This is far from sufficient under normal pleading requirements, much less the heightened standard Federal Rule of Civil Procedure ("Rule") 9(b) requires for alleging fraud.

Founded by Dr. Vohra, Vohra WPM and its associated entities (collectively, "Vohra") comprise one of the largest and most successful specialty wound care practices in the United States.  Patients in nursing facilities are particularly prone to developing significant wounds that need to be treated by specialists.  Vohra therefore contracts with these facilities to provide services, at patients' bedsides, that cannot be provided in-house.  And this case stems from the medical determination of hundreds of Vohra's specialists that some patients benefit from multiple surgical debridements—an advanced procedure that removes necrotic and devitalized tissue from an existing wound.

The Government conjures up three theories in an effort to back into FCA liability, but none withstand scrutiny.  The Government's first theory is based on a supposed lack of medical

necessity and is as incoherent as it is baseless. At times, this alleged scheme is one to perform "selective," not "surgical," debridements but then upcode the claims. At other times, the scheme is one to perform "surgical" debridements when only "selective" would have sufficed. At no point, however, does the Government cite any authority explaining what a "selective," versus a "surgical," debridement actually is. And as one reads the Government's description of the six examples of allegedly false claims (the *sine qua non* of a FCA presentment claim), it becomes abundantly clear that the Government has not taken the time to understand the distinction itself. Indeed, the Complaint vacillates wildly between simply introducing various medical concepts, with no explanation or support, and then concluding that whatever type of procedure was performed, such treatment could not have been medically necessary. None of this is sufficient for pleading falsity under Rule 9(b). Moreover, the Government makes little effort to connect Vohra to the submission of the claims where providers make their own medical decisions and submit their own claims. Nor could either party have done so knowingly where no one, including the Government, can identify the standard at issue.

The Government's second theory regarding the alleged billing for *unperformed* debridements is so underdeveloped that it is not clear if the Government even intended to assert it as a basis for relief in the first place. If the Government did, it certainly has not pled any facts in support. A vague reference to concerns raised by a single patient about "services" billed but not provided is not the type of particularized allegations that Rule 9(b) requires.

Lastly, the Government takes issue with the way that Vohra WPM's electronic medical records ("EMR") system was designed to "automatically" append Modifier 25 to claims where an additional wound was treated. Of course, the Government admits, as it must, that appending Modifier 25 is appropriate when the evaluation was "significant and separately identifiable," and,

for both patient examples in the Complaint, the Government admits that the treating physician evaluated a separate wound.  Like with the medical necessity theory, however, the Complaint fails to offer any reason to disagree with providers' conclusions that their evaluations were "significant" enough to warrant the use of Modifier 25.

The Government's tag-along claims for submitting false records and unjust enrichment fail for many of the same reasons.  The Government identifies a handful of statements that were automatically inserted into patients' medical records by the EMR, but it fails to identify any statements that were false.  Moreover, the unjust enrichment claim fails as to VHS Holdings, among other defendants, because it is not alleged to have been involved in the scheme at all.

At bottom, the Complaint leaves Defendants wondering what conduct the Government believes was fraudulent in the first place.  Much more is required from the Government, particularly when it has no insider knowledge that any fraud occurred.[1]  Because Defendants lack notice of the claims against them, the claims should be dismissed under Rules 12(b)(6) and 9(b).

## BACKGROUND[2]

Dr. Vohra is the founder and current Executive Chairman of Vohra WPM.  Compl. ¶ 22. VHS Holdings is the majority owner of Vohra WPM.  Compl. ¶ 21.

When a nursing facility has contracted with Vohra, Vohra wound care specialists are made available to the facility.  Compl. ¶ 91.  When a facility's primary care physician identifies a patient as requiring specialized wound services, the Vohra physician will evaluate the patient's needs and provide services at their bedside on an as-needed basis.   Compl. ¶ 91.  One procedure

---

[1] *See generally Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1276-77 (11th Cir. 2018) (allowing for some relaxing of pleading requirements where a relator alleges personal knowledge or participation in the fraud).

[2] Defendants dispute many of the Government's factual allegations, but Defendants accept them as true, as they must, for the purposes of this motion.  *See United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1303 n.2 (11th Cir. 2002).

often used to treat patients is known as debridement, which involves the removal of contaminated, devitalized, damaged, necrotic, infected, or foreign tissue from a wound in order to promote healing.  Compl. ¶ 67.  Debridement procedures can be classified as either surgical or selective.  Compl. ¶ 70.  Surgical debridement generally involves the excising of unhealthy or dead tissue to reset the healing process, whereas selective debridement similarly involves the scraping of unhealthy tissue but in a more superficial manner.  Compl. ¶¶ 68–69.

To streamline physicians' creation of medical records and generation of bills, Vohra WPM developed a proprietary EMR system tailored to these specialized procedures.  Compl. ¶¶ 121, 125, 126, 137, 139–40.  Medicare provides separate billing codes, known as CPT codes, for providers to use based on whether a "surgical" or "selective" debridement was performed. Compl. ¶ 70.  As a general matter, Medicare reimburses physicians at a higher rate for claims billed under the surgical debridement CPT codes than those billed under the selective debridement CPT codes.  Compl. ¶ 70.[3]  Medicare also provides add-on codes that can be applied to report any additional 20 square centimeters that were debrided from the patient's wound and therefore entail greater reimbursement.  Compl. ¶¶ 72–73, 130.  If a physician manages a different wound after performing a surgical debridement, this evaluation and management ("E&M") service can be billed if it was "significant and separately identifiable" from the debridement.  Compl. ¶¶ 81–84.  To do so, a modifier, known as Modifier 25, is appended to the E&M claim.  Compl. ¶ 84.

With the exception of only a few months, *see* Compl. ¶¶ 142–43, prior to April 2023, Vohra's specialists billed Medicare using the surgical debridement codes only, Compl. ¶ 119. Some of these claims also included Modifier 25.  Compl. ¶ 291.

---

[3] There are, however, certain situations where a lower reimbursement rate for surgical debridements may be applied. *See* 42 C.F.R. § 419.44(a).

On April 4, 2025, the U.S. Department of Justice brought this action directly on behalf of the Government, asserting the following three claims: (i) causing the presentment of a false claim (31 U.S.C. § 3729(a)(1)(A)) against Vohra WPM and Dr. Vohra relating to physicians' use of surgical debridement CPT codes and Modifier 25, (ii) causing to be made a false record or statement material to a false claim (31 U.S.C. § 3729(a)(1)(A)) against Vohra WPM and Dr. Vohra based on the Government's disagreement with how the EMR system was structured, and (iii) an unjust enrichment claim against Dr. Vohra, Vohra WPM, and VHS Holdings.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Because the claims sound in fraud, the heightened pleading standards under Rule 9(b) apply. *See Clausen*, 290 F.3d at 1308–09. Rule 9(b) requires that "a party [] state with particularity the circumstances constituting fraud or mistake." Plaintiffs must allege facts as to the "time, place, and substance of the defendant's alleged fraud," including "the details of the defendants' allegedly fraudulently acts, when they occurred, and who engaged in them." *Cooper v. Blue Cross & Blue Shield, Inc.*, 19 F.3d 562, 567–68 (11th Cir. 1994); *see also Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013–14 (11th Cir. 2005) (complaint must "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions"). "[G]eneral conclusory allegations of fraud" will not suffice. *Cooper*, 19. F.3d at 568. Rule 9(b) protects against "spurious charges of immoral and fraudulent behavior." *Clausen*, 290 F.3d at 1310 (internal quotations omitted).

## ARGUMENT

### I. The Government Fails to State a Presentation Claim Based on Medically Unnecessary Procedures.

To state a cause of action for presentment of a false claim, a plaintiff must establish "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, for payment or approval; (3) with the knowledge that the claim was false." *United States ex rel. Crocano v. Trividia Health Inc.*, 615 F. Supp. 3d 1296, 1303 (S.D. Fla. 2022) (citing 31 U.S.C. § 3729(a)(1)(A)); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016) (requiring that a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement . . . be material to the Government's payment decision").

The Government's primary theory is that Dr. Vohra and Vohra WPM caused physicians to bill Medicare for surgical debridements that were medically unnecessary.[4]  But the Government does not even explain the standard it purports to apply to determine when a surgical debridement is unnecessary or how the handful of claims identified purportedly meet that standard.  Without this explanation, the Complaint fails to plead fraud under Rule 9(b).  Moreover, the Complaint does not adequately allege that Dr. Vohra or Vohra WPM caused the submission of medically unnecessary claims or had the requisite intent in doing so.

## A.     The Complaint Does Not Adequately Allege Falsity.

### 1.     The Government Articulates Conflicting and Ambiguous Theories of Medical Necessity.

It is axiomatic that the Complaint must provide Defendants with "sufficient notice" of the acts of which the Government complains.  *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 198 F.R.D. 560, 562 (N.D. Ga. 2000), *aff'd*, 290 F.3d 1301 (11th Cir. 2002).  Rule 9(b) forbids plaintiffs from taking a "kitchen-sink approach" to claims of fraud where the plaintiff identifies a

---

[4] The Government's apparent disagreement with the clinical judgments of Vohra's physicians will not be sufficient to prove falsity in this case.  *See United States v. AseraCare, Inc.*, 938 F.3d 1278, 1296–97 (11th Cir. 2019).

broad range of conduct but declines to explain why the conduct constitutes fraud.  *See United States ex rel. Bernier v. InfiLaw Corp.*, 311 F. Supp. 3d 1288, 1298 (M.D. Fla. 2018).  Yet here, the Government's allegations are so incoherent and conflicting that they fail to put Dr. Vohra and Vohra WPM on notice of what they supposedly did wrong.

As an initial matter, it is impossible to discern from the Complaint what conduct the Government believes occurred.  For example, the Government takes issue with the medical necessity of performing multiple serial, surgical debridements on the same wound, *see* Compl, ¶¶ 111–12, but it is unclear whether the Government is asserting that physicians improperly billed these subsequent procedures as surgical debridements (when they should have been billed as selective) <u>or</u> actually performed surgical debridements (when only selective procedures should have been performed).  The Government also claims that Vohra physicians billed using unwarranted add-on codes, *see* Compl. ¶¶ 266, 268, but it is unclear whether the Government is asserting that physicians improperly used the add-on code (when they should have been billed with a lesser code) <u>or</u> actually performed the more expansive procedure (when only a less invasive procedure should have been performed).  This is far from sufficient under any pleading standard, much less the heightened standard under Rule 9(b).[5]

Nor does the Government explain its basis for alleging that claims using the surgical debridement CPT code were false.  The Government's medical necessity theory rests almost entirely on the distinction between a "selective" and a "surgical" debridement.  But the Government cites no statute, regulation, or payor guidance even purporting to explain the

---

[5] The Government is similarly vague and inconsistent in how it describes Defendants—both in its vague definition of "Vohra" and inconsistent uses of the defined terms "Vohra" and "Vohra Companies."  *See* Compl. ¶¶ 24–25; *compare* Compl. ¶¶ 6–7 ("Vohra contracts with hundreds of acute care facilities across the United States . . . . Vohra agrees to provide all wound care services to the contracted facilities' patients at no cost to the facilities."), *with* ¶ 86 ("[T]he Practice Entities [] contract with NFs and SNFs to provide physician services for wound care (and other skin issues) at patients' bedsides at no cost to the facilities.").  This is an independent ground for dismissal.  *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320–23 (11th Cir. 2015).

difference.  *See, e.g.*, Compl. ¶¶ 68–69 (defining the terms without citing to any authority).  At most, the Government quotes from one local coverage article providing only the vague and unworkable distinction between "deep and through skin" procedures (presumably "surgical" procedures) and those that are more "superficial" (presumably "selective" procedures).  Compl. ¶ 108.  It is likely for this reason that the Government itself cannot seem to articulate a consistent distinction between the two procedures.  *Compare* Compl. ¶ 164 (describing selective debridement as involving the removal of "some, but not all, necrotic tissue"), *with* ¶ 107 (recognizing that physicians must perform *multiple* initial surgical debridements in some circumstances "to remove all necrotic . . . tissue," presumably because the first surgical debridement removed some, but not all, necrotic tissue); *see also* Part I.A.2.

These pleading failures are not mere technicalities: Rule 9(b) provides an important protection for defendants against "spurious charges of immoral and fraudulent behavior." *Clausen*, 290 F.3d at 1310.  Because the Complaint fails to give Dr. Vohra or Vohra WPM notice of the fraud claims, the Government's medical necessity theory should be dismissed.

## 2. The Government Does Not Adequately Allege that False Claims Were Submitted for Any of the Six Patient Examples.

The Government's medical necessity theory fails under Rule 9(b) for an additional reason: there is no "indicia of reliability . . . to support the allegation [that] *actual false claim[s]* for payment [were] made to the Government," which is the "*sine qua non*" of a FCA violation. *See Clausen*, 290 F.3d at 1311; *see, e.g.*, *Barys ex rel. United States v. Vitas Healthcare Corp.*, No. 04-21431, 2007 WL 2310862, at *4–5 (S.D. Fla. July 25, 2007) (holding that the inclusion of details regarding the submission of claims did not excuse plaintiffs from identifying specific allegations demonstrating falsity); *United States ex rel. Lewis v. Cmty. Health Sys., Inc.*, No. 18-20394-CIV, 2020 WL 3103994, at *15–17 (S.D. Fla. June 11, 2020) (dismissing FCA case

where relators offered only "conclusory allegations of wrongdoing" and "facts [] left dangling, unconnected to the Relators' fraud allegations").

The Government attempts to meet the heightened pleading requirements of Rule 9(b) by describing claims for surgical debridements that were billed in connection with six patients. Without any insider information, however, the Government resorts to bald and conclusory claims that it was "implausibl[e]" that serial surgical debridements could have been necessary for these patients. Compl. ¶ 253. But implausibility is not falsity. In *Barys*, for example, this Court dismissed a presentment claim under Rule 9(b) where plaintiffs alleged that the Government was billed for hospice services to patients who were ineligible because the claim was based on "the misconception that evidence of lengthy patient participation in the hospice program is sufficient to raise an inference of fraud." *See Barys*, 2007 WL 2310862, at *5; *see also Corsello*, 428 F.3d at 1013 ("Although we construe all facts in favor of the plaintiff when reviewing a motion to dismiss, we decline to make inferences about the submission of fraudulent claims because such an assumption would strip all meaning from Rule 9(b)'s requirements of specificity.").

The Government's allegations are similarly lacking indicia of reliability here. The Government first assumes that any serial debridements provided to the six patients were billed improperly based on the frequency with which the procedures were performed. *See* Compl. ¶¶ 246–47, 251, 255, 257–58, 262, 264, 267, 276. But this allegation alone does not establish falsity. *See United States v. C/HCA, Inc.*, No. 19-14086, 2023 WL 8679766, at *7 (S.D. Fla. Nov. 9, 2023) (agreeing with "the general contention that alleged frequency of debridement procedures performed on patients alone is not enough to establish falsity"). The frequency of procedures does not provide an adequate basis from which to infer that the circumstances surrounding each *particular* patient made performing a surgical debridement unnecessary. In

fact, the Government admits, as it must, that "wound treatment protocol varies based on the characteristics of the individual patient and wound."  Compl. ¶ 109.[6]

The Government also claims that it is "implausible" that serial surgical debridements were necessary based on wholly unexplained, unsupported, and often unreasonable assumptions:

<u>Medicare Beneficiaries 1 and 2</u>

The Government offers one set of grainy, "before" and "after" photographs of each wound that the Government alleges was treated by Vohra's physicians.[7]  *See* Compl. ¶¶ 243–45, 248–50.  The Government then makes general observations regarding the wound and concludes that no surgical debridement was necessary and none was performed.  Why?  The Government does virtually nothing to connect the dots here.  *See United States ex rel. McKoy v. Atlanta Primary Care Peachtree, PC*, No. 3:21-cv-178, 2023 WL 8251324, at *5–6 (N.D. Ga. Oct. 24, 2023) (declining to infer that laboratory tests were medically unnecessary where the relator did not explicitly connect the allegations regarding the claims to an explanation of falsity, instead providing only "conclusory averments" that the tests were medically unnecessary).

<u>Medicare Beneficiaries 3 and 4</u>

The Government says it is "implausibl[e]" that a physician surgically debrided small amounts of necrotic tissue from these wounds.  *See* Compl. ¶¶ 253, 263.  But the Government

---

[6] As with much of the Complaint, the Government's description of the time period at issue is so incoherent that Defendants cannot decipher which claims were allegedly false.  *See, e.g.*, Compl. ¶ 255 (discussing 38 surgical debridements "between July 7, 2017 and November 10, 2017 and December 13, 2018").  At other times, the Government concludes that only some claims were false without explaining what, if any, distinction it is drawing between time periods.  *See, e.g.*, Compl. ¶¶ 262–65 (alleging that "at a minimum, the claims submitted for dates of service April 9, 2019, through August 6, 2019," were false without distinguishing these 14 claims from the broader set of 19 claims).

[7] Defendants accept, as they must on this motion, that these are the wounds that were debrided by Vohra's physicians and for which the physicians billed.  But patients often have multiple wounds treated on the same day, *see* Compl. ¶ 261, and the Government notably does not specify the location of the wound for which the billed-for debridement occurred.  If still necessary, Defendants plan to address this factual inaccuracy on summary judgment.

never alleges that it is inappropriate to remove "small amounts" of tissue using a surgical debridement.  Nor does it allege that doing so is indicative of a selective, rather than surgical, debridement.  In fact, the Government recognizes that removing <u>any</u> necrotic tissue "stimulates the wound to progress through the healing phases and can reduce the risk of infection, promote the production of healthy granulation tissue, and speed up the wound healing process."  Compl. ¶ 67.  The Government also points to the reclassification of Medicare Beneficiary 3's treatment goal as palliative, Compl. ¶¶ 252, 256–57, but again fails to connect the dots between this change and why a surgical debridement is unnecessary.  In fact, the escalation of the patient's wound to a Stage IV pressure injury seems to imply the procedure *was* necessary.  *See* Compl. ¶ 257.

<u>Medicare Beneficiary 5</u>

The Government claims it is implausible that the physician debrided "100 percent of the necrotic tissue" in Medicare Beneficiary 5's wound each successive week, Compl. ¶¶ 267–68, but its other allegations demonstrate that this is not what the medical records state.  The medical records describe the debridement of the entire surface area of the wound, but not the entire depth of necrotic tissue, meaning 100% of the necrotic tissue may not have been removed each week.  Specifically, the Government alleges that the EMR "automatically inserts the amount of necrotic or devitalized tissue *present* in the wound . . . as the amount of necrotic or devitalized tissue *removed* from the wound."  Compl. ¶ 266.  But the physician logged the amount of necrotic tissue present as "between 90 and 108 *square centimeters*"—which describes the size of the *surface area* of the wound, not the *depth* of the wound.  Compl. ¶ 268 (emphasis added).  Depth, on the other hand, is captured in cubic centimeters.  The Government offers no basis on which to infer that it is medically unnecessary for a physician treating such a large wound to perform successive surgical debridements, particularly where the debridement is being performed

11

bedside, rather than in a hospital.  In fact, the Government admits that, in some cases, successive surgical debridements are required.  Compl. ¶ 107.

Medicare Beneficiary 6

The Government provides no basis by which it is reasonable to infer that claims for surgical debridements to remove biofilm from Medicare Beneficiary 6's wound were false where the Complaint recognizes that "debridement may be indicated in certain scenarios where the presence of biofilm is suspected."  Compl. ¶¶ 272, 277–78.  The Government makes much of the wound's apparent progress in healing but provides no support for its disagreement with the treating physician's choice to surgically debride the biofilm, despite recognizing that biofilm "inhibits wound healing."  Compl. ¶¶ 272, 275–78.  Put differently, just because a wound is healing does not mean it will continue to heal with biofilm present.[8]

**B.      The Complaint Does Not Adequately Allege Causation.**

Because Dr. Vohra and Vohra WPM do not submit claims to Medicare on behalf of Vohra physicians, Compl. ¶ 28, the Government must also establish that Dr. Vohra and Vohra WPM caused the submission of the allegedly false claims.  *See* 31 U.S.C. § 3729(a)(1)(A); *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020) (applying a proximate causation standard); *see, e.g.*, *United States ex rel. Hartley v. Hosp. Auth. of Valdosta & Lowndes Cnty., Georgia*, No. 7:21-CV-72 (HL), 2023 WL 6702483, at *12–13 (M.D. Ga. Oct. 12, 2023) (holding that relator failed to allege causality where the defendant was involved in management and policy decisions but not the submission of claims).

---

[8] Nor are the Government's remaining general allegations sufficient to establish the submission of an *actual false claim*.  *See Clausen*, 290 F.3d at 1311.  Again, the frequency of debridement procedures generally, *see* Compl. ¶¶ 111–13, does not establish that any procedures were false, *C/HCA, Inc.*, 2023 WL 8679766, at *7.  The remainder of the allegations—the EMR's design, internal trainings, and the use of procedure metrics—relate to internal policies alone.  *See* Compl. ¶¶ 119, 154, 179–80, 188, 188–90.  They have nothing to do with actual claims.

There are no facts here suggesting that physicians did not make their *own* decisions about what, if any, debridement procedures were necessary for their *own* patients.  Although the Complaint references "misleading" trainings and "aggressive" surgical debridement targets for physicians, *see* Compl. ¶¶ 12–13, these are exactly the type of "broad references" that are insufficient under Rule 9(b) to connect a wound care practice to the submission of false claims for unnecessary debridements performed by its specialists.  *See United States v. Healogics, Inc*., No. 14-cv-283, 2016 WL 10540886, at *4–6 (M.D. Fla. Dec. 13, 2016).

Some of the facts alleged in *Healogics* are remarkably similar to those alleged here: Healogics trained staff to bill for surgical debridements when selective debridements were performed, instructed staff to perform frequent, unnecessary debridements, and applied a benchmark metric to pressure physicians with low debridement rates to increase their debridements.  *Id.* at *2; *see also United States v. Healogics, Inc.*, No. 6:14-cv-283, 2016 WL 2744949, at *1–2 (M.D. Fla. May 11, 2016).  But Relators also alleged that a physician discussed "doing things the 'Healogics Way'" and admitted that he ordered treatments because he "was under a lot of pressure from Healogics to increase the center's revenue."  *Healogics*, 2016 WL 10540886, at *4.  Rule 9(b) was still not satisfied, however, because Relators did not identify the treating physician or describe how this physician was pressured by Healogics, including who from Healogics carried out the pressuring and how this pressure was applied.  *Id.*

Here, the Government does not even identify a single physician in connection with the patient examples and makes no attempt to tie the treating physician to the alleged scheme.  At bottom, there is nothing suggesting that the supposed "pressure" campaign—to the extent it even occurred—had any effect on any Vohra physician.

13

Nor can the Government connect Dr. Vohra or Vohra WPM to the submission of purportedly false claims through their alleged design of the EMR. *See* Compl. ¶¶ 10–11. The Complaint fails to provide facts from which to conclude that any particular physician signed off on any particular EMR documentation that was not fully accurate. Such broad generalizations are not enough to connect Dr. Vohra and Vohra WPM to the submission of false claims. *See, e.g.*, *Healogics, Inc.*, 2016 WL 10540886, at *4–6. Moreover, the EMR always permitted physicians to opt to not log a debridement at all, Compl. ¶ 125, and therefore the Government offers no reason to conclude that Vohra physicians did not routinely do so.

### C.    The Complaint Does Not Adequately Allege Scienter.

The Government must show that Dr. Voha and Vohra WPM acted "knowingly," which means either "actual knowledge," "deliberate ignorance," or "reckless disregard." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017). Knowledge is lacking where the distinction between a "surgical" and "selective" debridement is so vague. If the Government cannot offer a precise distinction between the two procedures, *see* Part I.A.1., Dr. Vohra and Vohra WPM cannot have been expected to do so themselves. Although the Complaint cites three internal documents for the proposition that Dr. Vohra and Vohra WPM had actual knowledge of the difference, *see* Compl. ¶¶ 148–53, *see generally United States ex rel. Schutte v. Supervalu, Inc.*, 143 S. Ct. 1391 (2023), these scant references to "surgical" and "selective" debridements demonstrate just how inexact any definitions are. *See, e.g.*, Compl. ¶ 149 (explaining that a "selective" procedure is one that "discriminates between non-viable tissue," is "less extensive," has a "lower expectation of pain or bleeding," and is "most appropriate" for chronic wounds).

## II.     **The Government Fails to State a Presentment Claim Based on Allegedly Unperformed Procedures.**

The Government repeatedly insinuates that, in some instances, Vohra physicians billed for surgical debridement procedures despite having performed no procedure at all.  To the extent that the Government even intended to assert this as a basis for liability (it is not clear),[9] the theory should be dismissed at the outset because there are no facts whatsoever alleged in support.

The Complaint fails to offer any indicia of reliability to support the assertion that false claims were made to the Government based on this theory.  *Clausen*, 290 F.3d at 1311.  Far from identifying the who, what, where, when, and how of the scheme, *Corsello*, 428 F.3d at 1014, the Government devotes nearly all 350-paragraphs in the Complaint to other theories and offers only a few conclusory assertions that procedures also went unperformed entirely.  *See, e.g.*, Compl. ¶¶ 8, 15.  There are no specific allegations, however, regarding any claims that were false based on this theory.  At most, the Government says one patient raised vague "concerns" about "services billed [that] were not provided," *see* Compl. ¶ 214, without explaining whether those "services" included debridements.[10]  This is far from identifying the *actual* submission of a false claim.  *See Clausen*, 290 F.3d at 1311; *see, e.g.*, *United States ex rel. Aquino v. Univ. of Miami*, 250 F. Supp. 3d 1319, 1329–30 (S.D. Fla. 2017) (dismissing FCA case where the complaint detailed "questionable internal procedures" at a particular office but failed to allege the submission of a specific claim tied to a particular patient, surgery, record entry, or time and date).

---

[9] *See* Compl. ¶ 309 (presentation cause of action alleges only that Dr. Vohra and Vohra WPM caused the submission of "claims for payment to Medicare for unreasonable and unnecessary surgical excisional debridements and E/M visits").

[10] To the extent that the Government intended to identify Medicare Beneficiaries 1 and 2 in support of this theory, *see* Compl. ¶¶ 243–51, it should be required to state this directly rather than leaving Defendants to decipher for themselves the basis for the Government's claims.  *Barys*, 2007 WL 2310862, at *5 ("[A] plaintiff must demonstrate exactly why she believes the claims submitted were fraudulent."); *Weiland*, 792 F.3d at 1320, 1323 (holding that pleadings that "fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests" are violative of Rule 8(a)(2) or 10(b)).

And even if this single allegation were sufficient to establish falsity, which it is not, there are no facts suggesting that Dr. Vohra or Vohra WPM caused physicians to act this way.  In fact, the Government repeatedly alleges the opposite—i.e., that Dr. Vohra and Vohra WPM "trained [physicians] for years that (surgical excisional) debridement was required for essentially *all* subcutaneous, muscle or bone-depth wounds."  Compl. ¶ 168 (emphasis added); *see also* Compl. ¶ 166 (alleging physicians were trained "to provide, and . . . physicians did provide, selective debridements during the relevant time period").  The Government cannot have it both ways, and therefore any potential claims based on this theory should be dismissed.

## III.    **The Government Fails to State a Presentation Claim Based on Use of Modifier 25.**

The Government also alleges that Dr. Vohra and Vohra WPM caused the submission of false claims because the EMR was designed to automatically append Modifier 25 to E&M claims if any additional wounds were treated regardless of whether the evaluation was "significant."  Compl. ¶¶ 279–306.  Like with the Government's medical necessity theory, however, the Complaint does not adequately allege the required elements of falsity, causation, or scienter.

For falsity, the Government attempts to meet Rule 9(b)'s heightened pleading requirements by describing the use of Modifier 25 for claims that were billed in connection with only two patients.  Compl. ¶¶ 299–306.  The Government, however, fails to explain why either claim was false.  The Government admits, as it must, that additional wounds were evaluated by Medicare Beneficiary 7's and Medicare Beneficiary 8's treating physician.  Compl. ¶¶ 299, 303.  But the Government appears to believe that some "material" change in the patients' treatment plans is required to make these evaluations "significant."  Compl. ¶ 305.  Of course, the Complaint cites no statute, regulation, or binding payor guidance imposing such a rule (and Defendants are aware of none).  Nor does the Complaint provide any reason to credit the

Government's conclusory assertion that the discontinuation of an ointment, for example, is a "nonmaterial" change.  Compl. ¶ 305.  Moreover, the Government's general allegations with respect to how the EMR system was set up do not prove that any *actual* false claims were submitted.  *See Clausen*, 290 F.3d at 1311.

Even if the Government had alleged falsity, it has not alleged that Dr. Vohra or Vohra WPM knew these claims were false or caused the submission of those claims.  At most, the Complaint alleges that Dr. Vohra and Vohra WPM knew about the automated features of the EMR, Compl. ¶¶ 288–96, and that their coding practices deviated from common E&M coding practices in the industry, Compl. ¶¶ 296–97, but this does not demonstrate knowledge of the submission of a false claim.  *See, e.g.*, *United States ex rel. Headen v. Adams & Assocs., Inc.*, No. 4:16-CV-1164-VEH, 2017 WL 6017775, at *10 n.17 (N.D. Ala. Dec. 5, 2017) (holding that threadbare allegations of scienter were insufficient where relator alleged that defendants knew that regulations were not being followed or that certain numbers were being inflated but not that a false claim was being submitted).  The Government's causation argument is even weaker as to Dr. Vohra specifically because it does not allege facts suggesting that he was involved in developing this aspect of the EMR system.  *See, e.g.*, *Hartley*, 2023 WL 6702483, at *12–13.

## IV.     **The Government Fails to Allege a False Records Claim.**

To state a FCA cause of action for making a false statement, a plaintiff must establish: "(1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim."  *Crocano*, 615 F. Supp. 3d at 1303–04 (citing 31 U.S.C. § 3729(a)(1)(B)).  This claim fails for many of the reasons the Government's presentment claim fails.  *See Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014) (explaining that the elements under § 3729(a)(1)(A) and § 3729(a)(1)(A) are "practically

identical").  The Government offers no basis for concluding that surgical debridements were unnecessary, much less identifies any claims that were actually false.  *See supra* Part I.A.  Nor has the Government adequately alleged that Dr. Vohra or Vohra WPM had knowledge that false claims were being submitted.  *See supra* Part I.C.

In fact, this claim is even *more deficient* than the presentation claim because it requires proof of a false statement (that Dr. Vohra and Vohra WPM caused to be made) *in addition* to a false claim.  *United States ex rel. Reidel v. Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 81 (D.D.C. 2018); *see also United States ex rel. Franklin v. Parke-Davis*, No. 96-11651PBS, 2003 WL 22048255, at *1 (D. Mass. Aug. 22, 2003) (Section 3729(a)(2) contains "a double-falsehood requirement").  The false statement must be "material" to the false claim, i.e., it must have "play[ed] a meaningful role in causing payment of a specific claim."  *Crocano*, 615 F. Supp. 3d at 1309; *see Escobar*, 579 U.S. at 192.

The Government identifies statements that the EMR supposedly inserted "automatically" into patients' medical records but provides no basis for inferring that this information was false. The Government's primary theory is that physicians recorded the amount of necrotic or devitalized tissue in the wound and then the EMR automatically used this as the measurement for the amount debrided.  Compl. ¶¶ 128–37.  But, as explained above, these are measurements of the surface area of the wound, not the depth of the tissue debrided.  With respect to Medicare Beneficiary 5, for example, the Government provides no basis on which to infer that the physician did not actually debride the entire surface area of such a significant wound repeatedly but that this area stayed consistent in size.  *See* Compl. ¶¶ 266–68; *supra* Section I.A.2.

The Government also takes issue with the automatic inclusion of certain preprogrammed language in the records after the physician indicated that biofilm was present in the wound.

Compl. ¶¶ 274–78.  In connection with Medicare Beneficiary 6, the Government claims that the EMR automatically added "fabricated information" describing the physician as "surgically excis[ing]" biofilm and taking the wound bed back to "healthy bleeding."  Compl. ¶¶ 277–78. But there is no reason to believe this information was false: If the physician performed a surgical debridement, she likely "surgically excise[d]" the biofilm and took the wound back to "healthy bleeding," as the records note.  Compl. ¶¶ 277.  Moreover, these phrases have no bearing on whether a false claim was ultimately paid, and therefore materiality is not alleged.

With respect to the remaining aspects of the EMR that the Government finds problematic, the Complaint fails to allege how any of these features contributed to the making of a false statement or submission of a false claim.  The Government claims that the EMR was set up so that a debridement procedure was "mandatory" if any devitalized material was listed by the physician.  Compl. ¶ 125.  In the same paragraph, however, the Government admits that physicians could "override" the "mandatory" feature.  Compl. ¶ 125.  Moreover, the Government identifies certain categories of clinical observations that the EMR system prevented physicians from including, Compl. ¶¶ 126–27, but does not explain why this was problematic.  Nor can the Government point to the use of other pre-programmed statements, Compl. ¶ 11, without explaining what, if anything, was false or how the statements could be material.  Without making even a basic showing on the required elements, the false records claim must be dismissed.

**V.      The Government Fails to State an Unjust Enrichment Claim.**

To state an unjust enrichment claim, the Government must allege "(1) a benefit conferred upon [each] defendant by the plaintiff, (2) appreciation by the defendant[s] of such benefits, and (3) acceptance and retention of such benefit by the defendant[s] under such circumstances that it would be inequitable for him to retain it without paying the value thereof."  *United States ex rel. Borges v. Doctor's Care Med. Ctr., Inc.*, No. 01-8112-CIV, 2007 WL 9702639, at *17 (S.D. Fla.

Jan. 29, 2007) (applying federal common law) (internal quotations and citation omitted).  Rule 9(b)'s heightened pleading standard applies with just as much force to unjust enrichment claims sounding in fraud as it does to FCA claims.  *See Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1308 (11th Cir. 2022).

The Government fails to allege any of these elements as to VHS Holdings.  The Government's only reason for including VHS Holdings in the case appears to be because it is concerned that this entity *may* hold onto some of the profits and distributions made by Vohra WPM.  *See* Compl. ¶¶ 21, 22, 26, 34–36, 174.  But the Complaint does not allege that VHS Holdings did, in fact, receive or retain such benefits.  Even worse, the Complaint is devoid of any allegations relating to the entity's actual participation in the fraudulent conduct.  *Compare with United States ex rel. Heesch v. Diagnostic Physicians Grp., P.C.*, No. 11-0364-KD-B, 2014 WL 2155363, at *12 (S.D. Ala. May 22, 2014) (declining to dismiss unjust enrichment claim against indirect beneficiary where the indirect beneficiary "played a key role in helping to facilitate the unlawful scheme").  As a result, the Government has not alleged that it would be inequitable for VHS Holdings to retain a benefit indirectly received from the Government.

And the unjust enrichment claim is equally deficient with respect to Dr. Vohra and Vohra WPM.  Because there is no particularized basis by which it can be reasonably inferred that false claims were actually submitted or that either defendant caused the submission, *see supra* Parts I.A., I.B., II, and III, the Government has not adequately alleged that it would be inequitable for Dr. Vohra or Vohra WPM to retain funds received in connection with any of the claims at issue.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this motion and dismiss the Complaint.

Dated: May 16, 2025

MCDERMOTT WILL & EMERY LLP

*/s/ Oliver Benton Curtis, III*
Oliver Benton Curtis, III (FBN 118156)
bcurtis@mwe.com
Leah Palmer (FBN 1050765)
lpalmer@mwe.com
333 SE 2nd Avenue
Suite 4500
Miami, Florida 33131-4336
Tel: (305) 358-3500
Fax: (305) 347-6500

Mara Theophila (*pro hac vice pending*)
200 Clarendon Street
Floor 58
Boston, MA 02116
Telephone: (617) 535-4107
E-Mail:  mtheophila@mwe.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 16, 2025, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing

to all counsel of record.

*/s/ Oliver Benton Curtis, III*
Oliver Benton Curtis, III