**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:25-cv-21570-RKA**

UNITED STATES OF AMERICA ,

    Plaintiff

v.

DR. AMEET VOHRA; VOHRA WOUND
PHYSICIANS MANAGEMENT LLC; and
VHS HOLDINGS, P.A.,

    Defendants.
_____/

## UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The United States' Complaint alleges in detail how the Defendants engaged in a scheme to bill Medicare for hundreds of thousands of surgical excisional debridements—a *surgical* procedure involving the removal of all unhealthy or dead tissue so that healthy bleeding tissue is exposed—that were either a) not medically necessary or b) simply had not been performed. Defendants Dr. Vohra and Vohra WPM pressured, trained, and provided financial incentives for Vohra physicians to perform any debridement procedure—the surgical one or a less lucrative non-surgical one—during as many patient visits as possible regardless of the patients' needs. It did not matter which kind of debridement a Vohra physician performed because the Defendants' proprietary software ensured that Medicare was billed for the higher reimbursed surgical excisional procedure anyway. Defendants' scheme worked insofar as it allowed the Vohra Companies to repeatedly bill Medicare for unnecessary, or non-performed, surgical excisional debridements. To recover for this costly fraud, the United States has asserted claims against all Defendants under the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729-33, and the common law theory of unjust enrichment.

Faced with the strength of a 320-paragraph, detailed Complaint replete with specific examples of Defendants' fraudulent conduct, Defendants resort to a kitchen-sink approach in their motion to dismiss. They provide scant reasoning in articulating numerous bases for their motion, all of which can be summed up simply: (1) the Complaint fails to allege falsity, scienter, or causation for any of its FCA claims and (2) the Complaint fails to state an unjust enrichment claim.

The United States addresses why each of these arguments is meritless below. But the bottom line is that the Complaint contains details that far exceed what is required under Federal Rule of Civil Procedure Rules 8(a) and 9(b). The Complaint explains the nature of the Defendants' fraudulent scheme in detail and contains several specific examples of false claims that were submitted for multiple patients. The examples collectively contain names, dates, statements from emails, photographs of wounds, and information from patient medical records, claims data, and other sources. These detailed and specific allegations are more than sufficient to meet the pleading requirements of Federal Rules of Civil Procedure 8(a)(2) and 9(b).

Accordingly, the Court should deny Defendants' motion to dismiss.

## LEGAL BACKGROUND

### A. Federal Rules of Civil Procedure 12(b)(6), 8(a)(2) and 9(b)

In reviewing a motion to dismiss under Rule 12(b)(6), a district court must accept the allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *See Magluta v. Samples*, 375 F.3d 1269, 1273-74 (11th Cir. 2004). A motion to dismiss under Rule 12(b)(6) does not test whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim. Fed. R. Civ. P. 12(b)(6); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Dismissal under Rule 12(b)(6) is inappropriate unless it "appears beyond doubt that

1

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta*, 375 F.3d at 1273 (citations and internal quotation marks omitted).

Rule 8(a)(2) requires a short and plain statement of the claim showing that the plaintiff is entitled to relief, thereby giving the defendant fair notice of the basis for relief. *See Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555 (2007). To satisfy Rule 8(a)(2), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombley*, 550 U.S. at 570). Thus, all that is required to defeat a motion to dismiss is a complaint that sets forth sufficient factual allegations to plausibly support the relief requested. *See Twombley*, 550 U.S. at 570.

Rule 9(b) requires that the circumstances constituting fraud and mistake be stated with particularity, although knowledge can be alleged generally. Fed. R. Civ. P. 9(b); *see also Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2001). Rule 9(b), while requiring particularity, must not be interpreted to "abrogate the concept of notice pleading." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

## ARGUMENT

### A. The Complaint sufficiently alleges that Dr. Vohra and Vohra WPM caused false claims for surgical debridement to be submitted to Medicare

#### 1. The Complaint sufficiently alleges false surgical debridement claims

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false of fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Defendants argue that the government's complaint does not allege *false* claims because it fails to adequately distinguish between the two kinds of debridement procedures and to explain why the specific examples of false claims are false. This argument fails because the Complaint describes

2

with sufficient detail and specificity the distinction between the two types of procedures and their appropriate use.

Debridement describes the removal of devitalized or dead tissue from a wound to promote healing. Compl. ¶ 67. While a surgical procedure is sometimes necessary to accomplish this, often it is not necessary. *Id*. Surgical excisional debridement is a surgical procedure. Compl. ¶ 71. Selective debridement is not. Additional distinctions flow from this. As a surgical procedure, surgical excisional debridement is used as an initial action, cuts into healthy tissue, and is a more extensive procedure. Compl. ¶¶ 107-109, 150 (initial action); 68, 149 (cuts into healthy tissue); 149 (more extensive). Selective debridement is a non-surgical procedure that is used subsequent to a surgical debridement, or on a recurring basis or for maintenance. Compl. ¶¶ 69, 107-108. Selective debridement is less extensive and is used to remove targeted amounts of tissue. Compl. ¶¶ 69, 149.

Notwithstanding the clear differences between the two procedures (*e.g.*, one involves surgically cutting into healthy tissue, the other does not), Defendants argue that the Complaint does not cite to enough authority when it describes the two procedures and that its description of the distinction is inconsistent. MTD at 8. These arguments don't provide any basis for finding the allegations to be insufficient. In addition to its other well-pled allegations, the Complaint points to Medicare Administrative Contractor (MAC) guidance and other Medicare education materials generally, a local coverage article as a specific example, and Vohra WPM's own documents when discussing the differences between the procedures. Compl. ¶¶ 108-109, 148-152. That is more than enough at this stage of the case. The supposed inconsistency vanishes when you look at the actual Complaint. Compl. ¶¶ 157-164, 107.

**2. The Complaint sufficiently alleges the submission of false claims to Medicare**

An FCA complaint "must spell out the fraud in detail – what happened, who did it, when and where it occurred, and how it amounted to fraud." *Vargas v. Lincare*, 134 4th 1150, 1157 (11th Cir. 2025) (citing *Hopper v Solvay Pharm. Inc*. 588 F.3d 1318, 1324 (11th Cir. 2009)). Turning to the specific claim examples, the complaint must allege that the scheme led to false claims being submitted to the government and must do so with particularity. *Id*. This requirement can be satisfied in different ways but the core requirement is the same – the allegations must "do more than sketch out a theory," they must "allege facts showing a false claim was actually submitted." *Id*. at 1158. *See also generally U.S. ex rel. Clauson v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir., 2002) (some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the government); *U.S. ex rel. Hill v. Morehouse Med. Assocs.,* 82 Fed. App's 213, 2003 WL 22019936 (11th Cir. 2003) (noting that the identification of specific claims is only one way to satisfy Rule 9(b)'s requirements but is not the only way).

The Complaint satisfies these requirements. As described in the Complaint, from at least December 2017 to the present, Vohra WPM and Dr. Vohra engaged in a scheme to overbill Medicare for hundreds of thousands of surgical procedures that were not medically necessary or had not been performed, and for thousands of evaluation and management services that were not billable under Medicare coverage and coding rules. Compl. ¶¶ 8; 10-11; 111-115; 279-285. Boiled down, the scheme was to: (i) maximize the number of surgical debridements the Vohra Companies billed to Medicare and (ii) maximize how much the Vohra Companies billed for those procedures. As further described in the Complaint, Dr. Vohra and Vohra WPM drove the volume of procedures Vohra physicians performed through aggressive corporate targets and quotas that Dr. Vohra and Vohra WPM enforced through disciplinary actions, probation, and threats of termination. These

4

quotas were based on the business goals of the defendants and not the clinical needs of the patients they treated. Defendants then maximized how much they billed Medicare by creating an EMR system that, until April 2023, billed using only the more expensive surgical debridement procedure codes.

As alleged in the Complaint, Dr. Vohra and Vohra WPM's entire business model depended on billing only for surgical debridements and billing them at high volume. This was due in part to the difference in Medicare reimbursement rules for the two debridement procedures, and in part to the standard terms of the Vohra Companies business arrangements with nursing homes and SNFs. With respect to the difference in reimbursement rules, Medicare Part B reimburses physicians for surgical excisional debridement regardless of whether the service is performed in a nursing facility ("NF"), a skilled nursing facility ("SNF"), an assisted living facility ("ALF"), or a physician's office. Compl. ¶ 75. Reimbursement for selective debridement, however, works differently. Medicare will generally not pay a physician for a selective debridement because reimbursement for selective debridement is included in the bundled payment to the facility. Compl. ¶ 76-77. In that instance, the physician must bill the facility and not Medicare. Compl. ¶ 78-80.

The Complaint describes how Vohra capitalized on this situation by promising the skilled nursing facilities and nursing homes with which it contracted to provide all needed wound care at no charge to the facility. Compl. ¶ 86, 94-99, 143. Then, instead of performing selective debridements and billing the nursing homes, Dr. Vohra and Vohra WPM programmed their proprietary software to automatically assign a surgical procedure CPT code to every debridement procedure that Vohra physicians performed and every claim that Vohra WPM submitted to Medicare. Compl. ¶¶ 8, 121, 137-140, 145-147, 151-166, 239. It didn't matter at all what a physician actually did – every debridement was a surgical procedure for Medicare claims purposes.

Compl. ¶¶ 8; 10-11; 12; 154-166. The scheme worked. During this time period, more than half the Vohra Companies revenue came from Medicare payments on claims for surgical excisional debridement-coded procedures. Compl. ¶ 177.

With respect to specific examples of false claims that came out of this scheme, the Complaint describes at least 28 examples of false claims that were submitted to Medicare for six specific patients. Compl. ¶¶ 243, 248, 260, 265, 267, 276. The complaint describes the patients by age, sex and Medicare beneficiary status. Compl. ¶¶ 243, 248, 254, 261, 267, 275. The Complaint provides dates of service, details of the wounds that were ostensibly treated and the procedures that were billed, including the CPT codes on the claims. Compl. ¶¶ 243-245, 248-250, 254-257, 260-264, 267-268, 275. The Complaint explains why the claims were false. Compl. ¶¶ 245 (skin still intact, no surgical procedure), 250 (photo shows no surgical procedure), 252, 259-260 (not medically necessary due to palliative status, amount of tissue removed was vanishingly small and was removed week after week), 264, 267-268 (bill for extra tissue removed was based on made-up number), 269-274, 278 (not medically necessary because wound had achieved healing milestone; surgical procedure wound erase that and send wound back to start of process). Each of these claims are within the time period covered by the Complaint and connect directly to the broader scheme alleged in detail in the balance of the Complaint. The scheme drove high debridement volumes and then automatically billed those procedures using surgical excisional debridement codes to generate maximum revenue from Medicare, regardless of whether a surgical procedure was necessary, was performed, or whether no procedure was performed. *See* supra at 4-5. The histories of the six Medicare beneficiaries, detailed in the Complaint, including the 28 specific claim examples, shows the scheme worked. This satisfies 9(b).

Defendants argue in a scattershot way that the falsity of the specific examples is not adequately alleged, either because it must be inferred, the allegations are bald and conclusory, or they are based only on the frequency of debridement. None of these arguments survive scrutiny and the cases they cite are inapposite. In *United States ex rel. McKoy v Atlanta Primary Care Peachtree, PC* 2023 WL 8251324 (N.D. Ga. Oct 24, 2023), the relator offered only purely conclusory allegations that the tests at issue were medically unnecessary. *Id*. at *6. Here, the Complaint alleges facts that show why the specific claim examples were false. In *Barys ex rel. U.S. v. Vitas Healthcare Corp*., 2007 WL 2310862 (S.D. Fla. Jul 25, 2007), the relator offered only vague and conclusory statements about concerns expressed in meetings about the challenged practices, *id* at *7, and no factual basis to support the re-certification fraud alleged. *Id.* at *5. Here, the complaint provides specific, detailed allegations of both the fraudulent scheme and specific examples of false claims reflecting its success. As for *United States v. C/HCA, Inc*. No 19-14086, 2023 WL 8679766, at *7 (SD Fla. Nov. 9, 2023), the court there "agreed with the general contention" that while frequency of debridement alone – with nothing else – may be insufficient to allege falsity, where frequency of debridement is paired with more, such as additional specific allegations of upcoding, falsity is sufficiently pled. *Id* at *7. Here, the Complaint certainly has more.

Defendants remaining arguments are equally unpersuasive. Paragraphs 107-113 demonstrate the lack of medical necessity for extended serial surgical debridements. The Defendants, however, argue the Complaint fails to allege falsity because it has not also addressed whether surgical debridements were actually performed, whether selective debridements could have been billed, and whether selective debridements were actually performed. MTD at 7. The complaint is not required to answer these questions; it alleges the claims were false because they

demanded payment for a surgical procedure listed on the claim that was not reasonable and medically necessary, was upcoded or was not performed.  Likewise, Defendants insist that it is not clear why the United States thinks Vohra Companies' claims for payment for add-on CPT codes were false, MTD at 7, even though the Complaint alleges that Dr. Vohra and Vohra WPM programmed Vohra WPM's EMR to "essentially invent[] a number, put it in the medical record, and bill[] Medicare extra based on it…generating false records and statements" to support the add-on CPT codes in the claims Vohra Companies submitted to Medicare.  Compl. ¶¶ 268.  The claims are false because a made-up number triggered the inclusion of the add-on codes in the claims. Defendants' say these allegations are defective because they do not either allege or deny various hypothetical circumstances that are not alleged in the complaint. These arguments are not for the pleading stage and provide no basis for dismissing the Complaint.

### 3. The Complaint sufficiently pleads Dr. Vohra and Vohra WPM caused false claims to be submitted

For "cause to be presented" claims under the False Claims Act, "proximate causation is a useful and appropriate standard." *Ruckh v Salus Rehabilitation, LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020). The Complaint alleges with detail and specificity that Vohra WPM and Dr. Vohra were each a substantial factor in the submission of false claims for reimbursement, and the submission of those claims to Medicare was reasonably foreseeable.  Vohra WPM, with Dr. Vohra's active involvement, designed, directed, and implemented all aspects of the alleged scheme. The goal of the scheme was to generate maximum revenue from claims submitted to Medicare.  Thousands of false claims were ultimately submitted to Medicare for payment. See e.g., Compl. ¶¶ 8, 11, 15, 85, 110-112, 121-122, 135, 268.  This is sufficient.  *Ruckh*, 963 F.3d at 1107-1108 (evidence at trial that management wanted to use high reimbursement codes to keep revenue high, pressured

8

employees to use those codes irrespective of the services provided, and criticized employees who didn't meet or exceed use targets was sufficient to show causation).

Neither *United States ex rel. Hartley v. Hosp. Auth. Of Valdosta & Lownes Cnty., Georgia*, No. 7:21-CV-72 (HL, 2023 WL 6702483 (M.D. Ga Oct. 12, 2023), nor *United States v. Healogics Inc.,* No. 14-cv-283, 2016 WL 10540886 (M.D. Fla. Dec. 13, 2016) challenge this. In *Hartley*, the court dismissed an individual board member from the case because the allegations against him were extremely limited. *Id*., at *12-13. The extensive allegations with respect to Dr. Vohra and Vohra WPM don't compare.[1] In *Healogics*, the complaint was dismissed because it alleged no details about the pressure Healogics allegedly used to convince physicians to upcode selective debridements to surgical debridments and to perform unnecessary procedures. *Id*. at *5-6. The extensive allegations detailing the who, what, when and how of the pressure Dr. Vohra and Vohra WPM exerted here, in connection with the other aspects of the scheme readily distinguish this Complaint. Furthermore, in *Healogics* the treating physicians controlled what procedure would be billed. *Id* at *2. Here, the Complaint alleges a comprehensive scheme that removed that choice from the Vohra physicians. *See* supra at 4-5.

Defendants remaining arguments just contest facts alleged in the complaint, asserting the scheme had no effect on physicians or every single procedure performed by a Vohra physician was accurately recorded and billed. MTD 13, 14. These arguments are not for the pleading stage and provide no basis for dismissing the Complaint.

---

[1] Dr. Vohra leads the executive management team that runs Vohra WPM and is deeply involved in day-to-day operational decision-making at the Vohra Companies. The Complaint alleges he was involved in every aspect of the alleged scheme. Compl. ¶¶ 92, 100-106, 110, 123, 138, 141, 144-146, 148-151, 154, 167-180; 183-185, 187-189, 191, 196-207, 215, 216, 226, 230-237, 288, 293, 298. The allegations detailing Vohra WPM's actions and involvement are numerous and throughout the entire Complaint. Vohra WPM's conduct was directed by its executive management team, which included Dr. Vohra. Compl. ¶¶ 100-102; 104-106 Dr. Vohra directed the rest of the team in their roles. Compl. ¶ 103. The Complaint details actions by members of that team other than Dr. Vohra as appropriate. *See e.g.* Compl. ¶ .

9

### 4. The Complaint Adequately Pleads Dr. Vohra's and Vohra WPM's Knowledge

Under the False Claims Act, a defendant acts knowingly if the defendant acts with actual knowledge, deliberate ignorance or reckless indifference as to the truth or falsity of a claim. 31 U.S.C. § 3729(b)(1). The False Claims Act expressly "require[s] no proof of specific intent to defraud." *Id.*

Defendants argue that the Complaint does not adequately allege Dr. Vohra and WPM's knowledge under the False Claims Act because the distinction between surgical and selective debridement is "vague." MTD at 14. The distinction is clear enough that Dr. Vohra and Vohra WPM understood it. *See* supra at 3; Compl. ¶¶ 148-153. This provides no basis for dismissing the Complaint.

### B. The Complaint sufficiently alleges that Dr. Vohra and Vohra WPM caused false claims for evaluation and management services to be submitted to Medicare

### 1. The Complaint sufficiently alleges false evaluation and management claims using Modifier 25

Since at least 2016, Vohra WPM and Dr. Vohra engaged in a scheme to increase revenue by inappropriately appending Modifier 25 to patient encounters when they were not billable under Medicare coverage and coding rules. Compl. ¶¶ 279, 293. Programming their software to automatically generate E/M claims with Modifier 25 was another way to generate maximum revenue from debridement procedures. Compl. ¶ 279. A physician had no ability to stop the generation of the claim and modifier. Compl. ¶¶ 282-283, 291, 293. This was problematic because Medicare only pays for an E/M service on the same day as a surgical excisional debridement if the E/M service is both *separately identifiable* from the debridement and *significant* enough to independently support billing an E/M claim. Compl. ¶ 81-84, 280, 289-290 (emphasis added). What it means to be "significant" is well understood: the E/M service should be able to stand

10

alone as a medically necessary billable service.  It must "justify payment in terms of medical complexity and significant work…".  It is not supported where there are "no significant changes in a patient's condition, no new complaints, no changes in treatment plan."  Compl. ¶¶ 286, 289-290.  Vohra WPM and Dr. Vohra have understood this since at least 2014 and 2016 respectively, Compl. ¶ 289-290, 293-298, but continued to allow the EMR to generate and submit false claims for medically unnecessary E/M services for years.

Defendants' main argument that the government's complaint doesn't allege false claims for evaluation and management (E/M) services is that the Complaint does not explain why the two examples of false claims described in the Complaint were false.  MTD at 16. This argument fails because the Complaint answers this question with sufficient detail and specificity for both examples.

With respect to specific examples of false claims that came out of this aspect of Dr. Vohra and Vohra WPM's scheme, the Complaint describes two example claims that were submitted to Medicare for two specific patients.  Compl. ¶¶ 299, 303.  The Complaint describes the patients' wounds, the E/M service that was billed, the history of E/M services for the wounds, any changes in treatment plan for the wounds, and the CPT codes used to bill Medicare.  Compl. ¶¶299-302, 303-306.  The Complaint explains why the claims were false.  Compl. ¶¶ 300-301 (not medically necessary because no changes to the wound and no changes to treatment plan), Compl. ¶¶ (not medically necessary because only change to treatment plan was to discontinue topical antibiotic ointment).  Both claims are within the time-period covered by the Complaint, connect directly to the alleged scheme, and fail to meet the requirements for significance that Vohra WPM and Dr. Vohra have understood for a decade.  The EMR programming drove a high volume of E/M claims

11

regardless of whether a medically necessary billable service had actually been provided. In the example claims, it had not.

Finally, Defendants argue that the Complaint fails to plead the example claims were false because the Complaint doesn't cite to binding authority to define the standard and provides only a conclusory assertion that the discontinuation of ointment in the second example was insufficient. MTD at 16-17. These arguments are premature. In addition to its other allegations, the Complaint cites to Medicare contractor (MAC) guidance and Vohra WPM's own documents to detail a common understanding of what is required to append Modifier 25, and both support the falsity of the example claims. Compl. ¶¶ 286, 289-290, 293. That is enough at this stage of the case. Lastly, Defendants cite to *Clausen*, 290 F.3d at 1311 in passing, but what appears to be their point – that particularized allegations of a scheme don't substitute for well-pled examples of false claims submitted to the government – has already been addressed, *supra*.

**2. The Complaint sufficiently alleges knowledge and causation**

Under the False Claims Act, Dr. Vohra and Vohra WPM acted knowingly if they had actual knowledge of the false E/M claims submitted to the government, were deliberately ignorant, or were reckless with regard to the truth or falsity of those claims. 31 U.S.C. 3729(b)(1). Defendants assert that Dr. Vohra and Vohra WPM did not knowingly cause any false E/M claims to be submitted because at most, they knew only about the EMR's automation with respect to Modifier 25, and that Vohra WPM's coding deviated from industry practice. MTD at 17. At this stage, the government merely needs to allege that the Vohra WPM and Dr. Vohra failed "to make such inquiry as would be reasonable and prudent" to ensure compliance with what Medicare required. *Urquilla-Diaz*, 780 F.3d at 1058.

The detailed, specific allegations in the Complaint more than meet this standard. Dr. Vohra served in a significant operational role in Vohra WPM, including providing final approval for the EMR's billing logic. Compl. ¶¶ 10, 102-103, 121. Vohra WPM and Dr. Vohra were also aware of the Medicare rules surrounding Modifier 25 and of the problematic claims generated by the EMR system. Compl. ¶ 288. Nevertheless, they continued to allow the system to automatically generate claims and submit bills for improper E&M services. Compl. ¶¶ 288-297. Taken together, this is enough. Although the Complaint must allege a basis for Dr. Vohra and Vohra WPM's alleged knowledge, knowledge may be pled generally and does not need to satisfy Rule 9(b). That standard has been met here.

Defendants' final argument here – that Dr. Vohra is not adequately alleged to have caused false E/M claims to be submitted – fails as well. Unlike the Board member defendant in *Hartley*, who had no operational role, *see* supra at 9, Dr. Vohra played a significant operational role at Vohra WPM, including specifically with the EMR. Compl. ¶¶ 10, 100, 102-103, 106, 121. Having alleged that Dr. Vohra approved *all* the billing logic used in the EMR system, the Complaint does not also need to allege that he provided approval for the specific Modifier 25 billing logic. Furthermore, the Complaint alleges that Dr. Vohra, and members of his senior management team at Vohra WPM, were aware of problems with Modifier 25 claims for years, were concerned, yet did nothing. Compl. ¶¶ 288-297. The Complaint has adequately alleged causation here.

### C. The Complaint sufficiently alleges that Dr. Vohra and Vohra WPM caused false records material to false claims to be to be made or used.

Under the False Claims Act, a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable. 31 U.S.C. §

13

3729(a)(1)(B). The Complaint alleges with detail and specificity that Vohra WPM and Dr. Vohra programmed Vohra WPM's EMR to create false and misleading medical records to pass audits and ensure that Vohra Companies' Medicare revenue stream from false surgical excisional debridement claims would continue to grow. Compl. ¶122-137. Together with its detailed allegations of specific examples of false claims submitted to Medicare, Compl. ¶¶ 266-278, it is sufficient at this stage in the case.

### D. The Complaint sufficiently alleges an Unjust Enrichment Claim against all Defendant

Vohra WPM and Dr. Vohra were architects and active participants in the multi-year Medicare fraud detailed in this Complaint. Almost all the revenue generated by Medicare's payments on hundreds of thousands of false claims that were driven by Defendants' scheme flowed immediately to Vohra WPM under the Management Services Agreements it has in place with the Practice Entities. Compl.¶¶ 31-34. Because VHS Holdings owns 92 percent of Vohra WPM, VHS Holdings, in turn, was entitled to receive 92 percent of all profits and distributions from Vohra WPM funded by those Medicare dollars. Compl. ¶ 34. Dr. Vohra is the sole owner of VHS Holdings. *Id*. Once any of those funds are distributed by Vohra WPM to VHS Holdings, Dr. Vohra is entitled to take out 100 percent. The Vohra companies are set up to ensure that all monies collected from Medicare are controlled by Dr. Vohra, VHS Holdings and Vohra WPM. Compl. ¶ 35.

The elements of a cause of action based upon unjust enrichment are that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit." *Rapaport v. Office of Thrift Supervision*, 59 F.3d 212, 217 (D.C. Cir. 1995); *U.S. ex rel. Silva v. Vici Mktg.*, 361 F. Supp. 3d 1245, 1257 (M.D. Fla. 2019). Here, all three Defendants have been unjustly

enriched here. The United States conferred a benefit: millions of dollars in fraudulently obtained Medicare payments. The Defendants each accepted and retained that benefit: those funds flowed to Vohra WPM in the first instance. VHS Holdings and Dr. Vohra have in turn taken over $300 million in distributions since 2019 – an immense financial benefit funded by Medicare during a time frame when the fraud scheme was very active. Compl. ¶ 35. The United States has adequately pled that it would be inequitable for any of the Defendants to retain any portion of the proceeds of that fraud.

Should the Court dismiss any of the Government's claims, the Government respectfully requests that such dismissal be without prejudice and that the Government be granted an opportunity to amend its Complaint in Partial Intervention. Rule 15(a)(2) states that a "court should freely give leave [to amend] when justice so requires." "Ordinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005). The Government's May 8, 2024, Complaint in Partial Intervention was the first filed by the Government in this action, and the present motions to dismiss are Defendants' first responsive pleadings in this case. The Court should thus grant leave to amend the Complaint should any portion of Defendants' motion be granted.

## CONCLUSION

For the reasons stated, Defendants' motion to dismiss should be denied.

Dated: June 13, 2025

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

By: */s Kirsten V. Mayer*
JAMIE ANN YAVELBERG
ANDY M. MAO
KIRSTEN V. MAYER
DAVID M. FINKELSTEIN
SAMUEL P. ROBINS
Attorneys, Civil Division
Commercial Litigation Branch
United States, Department of Justice
PO Box 261
Ben Franklin Station
Washington, DC 20044
Tel: (202) 674-0164
Special Bar No. A5503349
Email: Kirsten.Mayer@usdoj.gov


HAYDEN P. O'BYRNE
United States Attorney
Southern District of Florida

By: */s Rosaline Chan*
ROSALINE CHAN
Assistant United States Attorney
Fla. Bar No. 1008816
BRADFORD C. PATRICK
Special Assistant United States Attorney
United States Attorney's Office
99 N.E. 4th Street
Miami, Florida 33132
Telephone: (305) 961-9335
Facsimile: (305) 530-7139
Email: Rosaline.Chan@usdoj.gov


*Attorneys for United States of America*

16

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 13, 2025, a true and correct copy of the foregoing was filed with the Court's electronic filing CM/ECF system, which automatically generates a notice of electronic filing on all counsel or parties of record.

                                            /s/ Kirsten V. Mayer_____
                                            Kirsten V. Mayer